GAZETTE TELEGRAPH CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 24861. Promulgated January 22, 1953.

*Dana Latham, Esq.*, and *John S. Welch, Esq.*, for the petitioner.
*W. Lee McLane, Jr., Esq.*, for the respondent.

FINDINGS OF FACT AND OPINION.

TIETJENS, *Judge:* Petitioner contests a determination of deficiencies in income tax and surtax under section 102 of the Internal Revenue Code for the fiscal years ended March 31, 1947 and 1948, as follows:

| Year | Income tax deficiency | Deficiency under sec. 102, I. R. C. |
|------|------|------|
| 1947 | $18,709.15 | $30,714.82 |
| 1948 | 18,127.65 | 44,982.73 |

Several issues raised by the pleadings have been abandoned by petitioner. The following questions remain for decision:

Issue No. 1. Did petitioner properly deduct amounts representing amortization of the cost of a covenant not to compete?

Issue No. 2. Did petitioner properly deduct amounts paid as interest expense?

Issue No. 3. Is petitioner in either year subject to the surtax imposed by section 102 of the Internal Revenue Code?

FINDINGS OF FACT.

The facts stipulated by the parties are found as stipulated.

Petitioner's income tax returns were filed with the collector for the district of Colorado.

*Issue No. 1.*

Petitioner is a corporation organized under the laws of Colorado on March 28, 1946. During a portion of the fiscal years in question it engaged in the publication of two daily newspapers and during the rest of the period, one daily newspaper in Colorado Springs, Colorado.

Petitioner is one of a number of newspaper businesses owned by members of the R. C. Hoiles family or by corporations in which that family was interested. The Hoileses have been engaged in the newspaper business for many years, R. C. Hoiles himself for more than 50 years. During this period many newspapers have been acquired and at various times the Hoileses, either directly or through corporations, have owned and operated three papers in Ohio, two in California, one in New Mexico, and two in Texas, in addition to petitioner.

On March 31, 1950, three of these newspaper corporations, including petitioner, were merged with the Register Publishing Company, Ltd., at Santa Ana, California, the name of the surviving corporation being immediately changed to Freedom Newspapers, Inc.

These various newspapers are and have been published in cities ranging in population from 10,000 to 40,000. They are dailies and

when acquired were in areas where the subscriber and advertising fields were thought not to be saturated. The Hoiles family have pursued a plan of expanding their newspaper interests by acquiring newspapers in new and relatively undeveloped fields.

In negotiating for the purchase of newspapers the Hoileses or the corporations in which they were interested have, without exception, insisted upon and obtained agreements by the sellers to refrain from competition in the area for a fixed period of years. Such covenants have been of value and importance to the buyers.

In August 1945 the Hoileses became interested in the purchase of Gazette and Telegraph Company, a corporation which was publishing newspapers in Colorado Springs, Colorado, the stock of which was owned by the following shareholders (hereinafter sometimes called the sellers) in the amounts set opposite their names:

| | |
|---|---|
| Clarence Clark Hamlin Trust | 1146 shares |
| T. E. Nowels | 950 shares |
| Richard W. Nowels | 100 shares |
| El Pomar Investment Company by Charles L. Tutt, Vice Pres | 1248 shares |
| Charles L. Tutt | 703 shares |
| John A. Carruthers | 254 shares |
| Mae A. Carruthers | 77 shares |
| Marguerite Ross | 156 shares |
| Elizabeth H. Hylbom | 2 shares |
| Frank R. Wadell | 100 shares |
| Grace C. Foster and Helen Francis Foster | 104 shares |
| James R. Miller | 60 shares |
| Seddie G. Hamlin | 100 shares |

T. E. Nowels was the president and general manager of Gazette and Telegraph Company. He was well known in the community and had had wide experience as a newspaper publisher. He was in good health and had no intention of retiring. Richard W. Nowels was the son of T. E. Nowels and was employed by Gazette and Telegraph Company. He presently publishes a newspaper in or near San Francisco. Charles L. Tutt was a man of great wealth who controlled El Pomar Investment Company, a substantial investment corporation, and was head of the Broadmoor Hotel, a very wealthy and influential organization. He was well known in Colorado Springs. John A. Carruthers was a lawyer who devoted most of his time to the affairs of the organizations headed by Tutt. He too was well known and highly respected in the community. Frank R. Wadell was managing editor of Gazette and Telegraph Company. He was a capable man and had had wide experience in the newspaper business. The Clarence Clark Hamlin Trust had been created by Hamlin, former president and manager of Gazette and Telegraph Company. James R. Miller was bookkeeper for the company. The other stockholders

were relatives of or otherwise closely connected with persons who were or had been associated with the company.

In the fall of 1945 a series of letters was exchanged between R. C. Hoiles and T. E. Nowels regarding the acquisition of the Colorado Springs newspaper properties. Hoiles made it clear that the buyers would insist upon a covenant not to compete from the sellers and indicated the buyers' intention to treat the covenant not to compete as a capital asset subject to amortization over its fixed life. In the fall of 1945, R. C. Hoiles went to Colorado Springs and inspected the properties and looked over the area. At that time he made an oral offer of $750,000 to the sellers for their stock. On December 4, 1945, Nowels wrote Hoiles rejecting the offer and stating that he and the other stockholders thought that their entire setup was worth no less than a million dollars.

After asking for and obtaining additional information as to paper supplies, union scales, salaries, and other items, Hoiles wrote Nowels on December 24, 1945, offering to pay one million dollars for all the stock of the corporation and a "restraining order" from entering the newspaper business in the area for ten years.

On December 27, 1945, Nowels replied to the offer stating that it would be given immediate and serious consideration, pointing out that it would be hard for him to make a decision since he would be selling not only his stock, but also his occupation.

On or about January 8, 1946, R. C. Hoiles and his two sons, C. H. Hoiles and Harry Hoiles, went to Colorado Springs and conducted final negotiations for the purchase. On January 10, the following written contract was executed by the selling stockholders and the three Hoileses:

AGREEMENT Made and entered into this 10th day of January, A. D., 1946, by and between R. C. HOILES, CLARENCE HOILES, and HARRY HOILES, all of Santa Ana, California, as First Parties, and the undersigned stockholders of The Gazette and Telegraph Company, as Second Parties,

WITNESSETH:

WHEREAS, First Parties desire to purchase all of the shares of stock of The Gazette and Telegraph Company or at least seventy percent (70%) thereof, and,

WHEREAS, Second Parties desire to sell and dispose of their stock in the said The Gazette and Telegraph Company at the price and on the terms hereinafter set forth.

NOW THEREFORE, in consideration of the mutual covenants and agreements of the parties hereto, it is understood and agreed:

1. First Parties agree to pay to each of the undersigned Second Parties the sum of Two Hundred Dollars ($200.00) per share for each share set opposite the name of each of the Second Parties upon proper assignment and delivery to First Parties of the certificate or certificates representing the ownership of Second Parties in the stock of The Gazette and Telegraph Company.

2. Second Parties and each of them agree as part of the consideration hereof that they and each of them will not engage in the newspaper publication or distribution business in competition with First Parties, their successors and assigns, in the County of El Paso, State of Colorado, for a period of ten (10) years from and after the date hereof.

3. First Parties and Second Parties have agreed that the two items of said sale are evaluated as follows, to-wit: (a) the stock per share of the corporation, $150.00, and (b) the prohibition and refraining from carrying on business as set forth in Paragraph 2 hereof, $50.00.

4. Second Parties and each of them agree to indemnify and hold First Parties, their successors and assigns, free and harmless from any liability for suits for libel because of or as a result of publication of any article or articles in the papers owned by The Gazette and Telegraph Company prior to January 10, 1946.

Negotiations for the purchase of said stock and the said covenant not to compete were conducted at arm's length by strangers in interest. The price of said stock was fixed by the parties at $750,000 and the price of said covenant at $250,000. The contract is divisible in respect of said two items and the amount of $250,000 was actually paid for the said covenant and was intended by the parties to be the price thereof. The sellers were fully advised that the buyers wanted a definite value to be placed upon said covenant and that the buyers intended to treat said covenant as an asset to be amortized over the period of its life. The buyers insisted upon a fixed and separate consideration for the convenant not to compete in order to establish its value and also for the purpose of fixing liquidated damages to be paid in the event of its breach.

If the purchase agreement had not contained a covenant not to compete, the sellers could have established a competing newspaper in Colorado Springs.

When the petitioner was organized on March 28, 1946, one of the assets transferred to it by the Hoiles' interests in return for petitioner's stock and other obligations was said covenant not to compete. Said covenant was specifically made assignable by the original contract of sale.

*Issue No. 2.*

Early in January of 1946, the Hoiles' interests definitely decided to obtain the stock of the Gazette and Telegraph Company at $750,000 and the covenant not to compete for $250,000. They and certain of their corporations and other business organizations in which they were interested determined that they had available for investment and for loaning to the new enterprise a maximum of $500,000.

The various parties put up this $500,000 as set forth below, using Register Publishing Company, Ltd., as agent for the assembly of funds. Such proportions were tentative, it not having been decided what the

final investments of the parties would be. The remaining $500,000 was always intended to be borrowed on a long term basis from a regular loaning institution such as a bank or insurance company. It was impossible to negotiate said long term loan by January 10, 1946, when the stock purchase was consummated. Instead, R. C. Hoiles, his wife Mabel S. Hoiles, Mabel S. Hoiles as trustee of a family trust, Harry Hoiles, and Jane Hoiles Hardie, both being children of R. C. and Mabel S. Hoiles, and the Register Publishing Company, Ltd., borrowed $500,000 from the Santa Ana Branch of the Bank of America on their individual notes pledging securities, which they individually owned, as collateral. The notes were for 90 days with interest at 3 per cent. The $500,000 borrowed was on two separate notes as follows:

Register Publishing Company, Ltd._____ $152,055
Certain Hoiles family members_____ 347,045

A number of persons for whom R. C. Hoiles, Clarence H. Hoiles, and Harry Hoiles were acting in purchasing the stock of the Gazette and Telegraph Company on January 10, 1946, and who subsequently, acquired 35 per cent of the stock of petitioner, namely, Clarence H. Hoiles, Mabelle Hoiles, Adam and Corinne Boryczka, and Crawford County Printing & Publishing Company, did not participate in said loans or agree in any way to be liable for any portion thereof.

The $500,000 borrowed from the Bank of America as set forth above, together with the $500,000 which had been assembled by Register Publishing Company, was then deposited with the Santa Ana Branch of the Bank of America and forwarded to the First National Bank in Colorado Springs for the credit of R. C. Hoiles and there paid by him as the consideration required by the contract set forth above.

The individual amounts as finally assembled on January 10 were as follows:

| Name | Own funds | Borrowed from Bank of America |
|---|---|---|
| R. C. Hoiles | $82,000 | $170,000 |
| Mrs. R. C. Hoiles | 20,000 | 27,045 |
| Jane Hoiles Hardie | 22,500 | 20,000 |
| Crawford County Printing and Publishing Company | 63,000 | |
| Harry Hoiles | 41,000 | 20,000 |
| C. H. Hoiles | 81,200 | |
| Mrs. C. H. Hoiles | 13,600 | |
| Mrs. R. C. Hoiles, Trustee | 139,000 | 110,000 |
| Register Publishing Co., Ltd. | 36,200 | 152,955 |
| Corinne and Adam Boryczka | 1,500 | |
| Totals | $500,000 | $500,000 |

The Hoiles' interests had no desire to acquire the Gazette and Telegraph Company as a going corporation. They were interested only in the underlying assets of such corporation and the elimination of future competition on the part of the selling stockholders. They

would have bought the corporate assets instead of the stock if the interested parties had been willing to deal on that basis. The corporate life of the Gazette and Telegraph Company was due to expire by the terms of its amended charter on March 15, 1946. Its corporate powers were too limited to suit the purposes of the purchasers, and they at the time of purchase had not definitely decided whether or not to operate the business through an entirely different type of corporation or through a partnership or similar unincorporated medium. Immediately upon the acquisition of the stock of Gazette and Telegraph Company the buyers set about to liquidate it and upon liquidation its assets were distributed to the buyers as tenants in common.

The Hoileses have operated other newspapers as corporations or partnerships as the particular situation seemed to require and in January of 1946 they had made no definite determination as to what business form the new enterprise should take. For several months thereafter the newspapers were published under an informal agreement of partnership or tenancy in common among the buyers in accordance with which Harry Hoiles held title to all of the assets in trust for himself and the other parties in proportion to their investment in the venture.

On or about March 28, 1946, the Hoileses reached a final decision, that they should conduct the new enterprise in the form of a corporation and on that day petitioner was organized. It was decided to operate as a corporation in order to avoid personal liability of the stockholders, to facilitate the completion of the permanent financing, to improve the credit of the buyers, and to maintain their other interests unencumbered by this venture.

The individual owners of the assets of the old company offered to transfer said assets and certain cash together with the covenant not to compete to petitioner in exchange for $250,000 in stock, and notes in the amount of $660,000. In this connection, after the dissolution of the old company the recipients of the assets had taken $90,000 of the cash received in liquidation and transmitted it to the Bank of America to apply against the 90-day notes totaling $500,000. The $660,000 represented the $500,000 notes less the $90,000 paid, or $410,000 plus notes to the stockholders in the amount of $250,000.

This offer was accepted by petitioner and stock and notes were issued accordingly. The notes were fixed and definite obligations of petitioner. They were entered and carried on petitioner's books as notes payable. For convenience the $410,000 note was made payable to Register Publishing Company, Ltd., on behalf of the Register and the particular members of the Hoiles family who had borrowed the original $500,000 from the Bank of America. It bore interest at 3 per cent and was payable 1 year after date. The notes to the stockholders bore interest at 5 per cent and were payable 10 years after date.

2,500 shares of common stock, $100 par, were issued on April 1, 1946, as follows:

| No. of shares | To whom transferred |
|---|---|
| 1 | Harry Hoiles |
| 1 | R. C. Hoiles |
| *1 | T. E. Nowels |
| 1 | C. H. Hoiles |
| 1 | Mrs. R. C. Hoiles |
| 409 | R. C. Hoiles |
| 99 | Mrs. R. C. Hoiles |
| 672 | Mrs. R. C. Hoiles, Trustee |
| 124 | Jane Hoiles Hardie |
| 212 | Harry Hoiles |
| 326½ | C. H. Hoiles |
| 150 | Mrs. C. H. Hoiles |
| 150 | The Crawford County Printing and Publishing Company |
| 7½ | Adam Boryczka |
| 180 | Register Publishing Co., Ltd. |
| 165 | Crawford County Printing and Publishing Company |

*Note.—On January 10, 1947, T. E. Nowels transferred one share to Barbara C. Hoiles.

The amount of $250,000 was an adequate capital structure for petitioner's business operations. It was sufficient to meet the requirements of paper suppliers, news services, and syndicates.

The buyers did not contribute any more than the necessary amount of capital because they intended to continue their program of expansion and needed to keep themselves in as liquid a position as possible. In addition they felt that by taking notes they would be in a better position to take care of estate and inheritance taxes in the event of the death of one of them. Also they determined that in order to obtain credit in the future they would be in a better position if they had notes to offer as collateral rather than closely held stock. Furthermore, in the event the venture did not succeed, they intended to place themselves in the position of other unsecured creditors and share on a par with them. Finally, they did not want to be forced to change the proportion of equity ownership in the event of the need of one of them to raise funds.

The 90-day notes to the Bank of America representing the original $500,000 matured on April 10, 1946. Prior to that time, R. C. Hoiles on behalf of petitioner began negotiations with said Bank for a long term loan to be assumed by the new enterprise in substitution for said 90-day notes. Difficulty arose due to the fact that the Bank of America did not wish to loan money to a Colorado corporation doing business in Colorado. On April 10, 1946, said original 90-day notes were renewed so that negotiations for permament financing could continue. In June 1946, the original obligations to the Bank of America were

reduced to a total of $400,000 by a payment of $10,000 by petitioner on the $410,000 note to the Register which in turn was applied against the Bank of America loans.

In July of 1946 the Bank of America determined that it would loan $400,000 to petitioner provided that Register Publishing Company, Ltd., a California corporation with substantial holdings in the State of California, became jointly liable on the obligation in order to give the bank the additional security which it felt was required. The transaction was completed on August 12, 1946, by the execution of an unsecured 5-year installment note at 3 per cent under a term loan agreement. Among other things said loan agreement provided: "5.9 The COMPANIES will not declare or pay dividends upon their shares of stock now or hereafter outstanding."

The original 90-day notes were then cancelled by the Bank of America and the collateral returned to the owners and petitioner became obligated on said long term loan. At the same time the $410,000 note to the Register also was cancelled.

During the life of the Bank of America loan, Register Publishing Company acted as a paying agent for petitioner, receiving amounts of principal and interest from petitioner and promptly transmitting them to the Bank of America. The entire amounts of principal and interest which were paid on this loan were actually paid by petitioner. Register Publishing Company paid nothing from its own funds on this loan and never expected to do so.

During the two fiscal years here under review, payments of principal on this loan totaled $175,000, as follows:

| | |
|---|---:|
| (a) During fiscal year 1947: | |
| February 11, 1947 | $25,000 |
| (b) During fiscal year 1948: | |
| August 18, 1947 | 50,000 |
| August 27, 1947 | 25,000 |
| February 9, 1948 | 25,000 |
| March 2, 1948 | 50,000 |
| Total | $175,000 |

No part of the principal of the notes issued to petitioner's stockholders was paid during said years.

During the two fiscal years under review, payments of interest on the foregoing loan and its predecessor loan totaled $22,795.84, as follows:

| | |
|---|---:|
| (a) During fiscal year 1947: | |
| July 6, 1946 | $3,000.01 |
| August 19, 1946 | 1,333.33 |
| December 31, 1946 | 4,000.00 |
| February 28, 1947 | 2,100.00 |
| March 31, 1947 (accrual) | 834.33 |
| | $11,267.67 |

(b) During fiscal year 1948:

| | |
|---|---|
| August 31, 1947 | $4, 821. 92 |
| February 28, 1948 | 4, 643. 75 |
| March 31, 1948 (accrual) | 2, 062. 50 |
| | 11, 528. 17 |
| Total | $22, 795. 84 |

During the fiscal years 1949 and 1950 further payments of principal and interest were made which constituted the entire balance due on said $400,000 loan.

As noted, promissory notes of petitioner in the aggregate amount of $250,000 were executed in favor of the stockholders of petitioner. Said notes bore interest at 5 per cent and became due and payable in 10 years. During the two years under review, payments of interest on said notes totaled $25,000, as follows:

| | |
|---|---|
| (a) During fiscal year 1947 | $12, 500 |
| (b) During fiscal year 1948 | $12, 500 |

Said payments were made to the owners of said notes. During said two years some of said notes had been sold or transferred by some of the payees to members of their families and accordingly said interest payments were not in proportion to the stockholdings.

During the fiscal years 1949 and 1950, payments of principal on said notes, constituting the entire balance due thereon, except for $18,100 due Register Publishing Company, Ltd., which was cancelled in the merger, were made.

The comparative percentages of stock ownership in petitioner and of said notes at time of payment thereof are as follows:

| Name | Percentage of stock | Percentage of notes |
|---|---|---|
| Adam Boryczka | .30 | .30 |
| R. C. Hoiles | 16.40 | 16.40 |
| Harry Hoiles | 8.52 | 8.76 |
| Mrs. R. C. Hoiles | 4.00 | 4.00 |
| Mrs. R. C. Hoiles Trustee | 26.88 | |
| C. H. Hoiles | 13.10 | |
| Jane Hardie | 4.96 | 18.40 |
| Barbara Hoiles | .04 | 1.20 |
| Pamela J. Hoiles | | 6.00 |
| Penelope A. Hoiles | | 6.00 |
| Judith Ann Hoiles | | 1.75 |
| Mary Elizabeth Hoiles | | 1.75 |
| Patricia Evelyn Hoiles | | 1.75 |
| James Howard Hoiles | | 3.75 |
| Mabelle Hoiles | 6.00 | 10.10 |
| Crawford County Printing & Publishing Co | 12.60 | 12.60 |
| Register Publishing Co., Ltd | 7.20 | 7.24 |
| Totals | 100.00 | 100.00 |

During the fiscal years 1949 and 1950, payments of interest were made on said notes in the sums of $12,500 and $10,948.97, respectively.

All of the notes on which said interest was paid were bona fide obligations of petitioner and the amounts so paid were interest payments.

*Issue No. 3.*

Comparative balance sheets for petitioner for the following dates are:

Balance Sheets 1946–1948

| ASSETS | Opening B/S 4-1-46 | Closing B/S 3-31-47 | Closing B/S 3-31-48 |
|---|---|---|---|
| Cash | $6,247.47 | $58,326.61 | $19,834.26 |
| Receivables | 39,524.68 | 58,100.03 | 74,762.54 |
| Inventories | 6,813.61 | 22,835.89 | 24,261.30 |
| Other Investments | 3,075.00 | 1,150.00 | 58,854.43 |
| Autos | | 3,350.22 | 3,350.22 |
| Buildings | 86,407.12 | 86,407.12 | 86,407.12 |
| Machinery | 102,100.57 | 106,435.12 | 126,560.70 |
| Press | 80,367.28 | 80,367.28 | 97,115.53 |
| Land | 70,667.00 | 70,667.00 | 70,667.00 |
| Agreement Not To Compete | 244,444.46 | 219,444.47 | 194,444.47 |
| Goodwill | 351,909.68 | 352,497.37 | 352,496.49 |
| Sundry & Prepaid Deposits | 9,047.77 | 13,060.19 | 1,400.00 |
| | $1,000,604.64 | $1,072,641.30 | $1,110,154.06 |

| LIABILITIES | | | |
|---|---|---|---|
| Reserve for Depreciation | | $18,986.92 | $40,463.74 |
| Accounts Payable | $67,687.17 | 1,083.52 | 1,083.52 |
| Notes Payable | 660,000.00 | 625,000.00 | 475,000.00 |
| Taxes & Miscellaneous | 16,037.29 | 5,858.93 | 3,601.73 |
| Accrued Interest | | 3,959.33 | 5,187.50 |
| Circulation Prepaid | 3,853.33 | 3,892.54 | 3,892.54 |
| Carrier Bonds | 3,026.85 | 2,345.55 | 2,706.25 |
| Calif. Income Tax Accrued | | 4,068.04 | 7,116.29 |
| Federal Income Tax Accrued | | 59,813.41 | 84,836.41 |
| Capital Stock | 250,000.00 | 250,000.00 | 250,000.00 |
| Surplus | | 97,633.06 | 236,266.08 |
| | $1,000,604.64 | $1,072,641.30 | $1,110,154.06 |

| Surplus Reconciliation: | | | |
|---|---|---|---|
| Beginning Surplus | | | $97,633.06 |
| Net Profit | | $160,466.08 | 225,785.72 |
| Surplus Adjustments | | (3,151.57) | |
| Income Tax | | (59,681.45) | (87,152.70) |
| Ending Surplus | | $97,633.06 | $236,266.08 |

The breakdown on petitioner's balance sheet for "Other Investments" is as follows:

(a) Balance April 1, 1946 _____ $3,075.00

| Detail: | No. of shares | Cost |
|---|---|---|
| National Press Bldg Corp | 25 | $2,500.00 |
| Associated Press Bond | | 275.00 |
| New El Crest Mining Co | 30,000 | 300.00 |
| | | $3,075.00    $3,075.00 |

The foregoing securities were assets received on dissolution of Gazette and Telegraph Company:

(b) Balance March 31, 1947 _____ $1,150.00

| Detail: | | |
|---|---|---|
| National Press Bldg. Corp | 25 | $0.00 |
| New El Crest Mining Co | 30,000 | 125.00 |
| Associated Press Bond | | 125.00 |
| 414 N. Custer | | 900.00 |
| | | $1,150.00    $1,150.00 |

·During the fiscal year 1947 National Press Building stock was determined to be worthless. The New El Crest Mining Co. stock and the Associated Press Bond were apparently written down as noted in the above schedule. 414 N. Custer constituted a down payment on a house that petitioner purchased to furnish housing for its employees. It was later sold to one of the employees.

(c) Balance March 31, 1948_____ $58,854.43

Detail:

| | | |
|---|---:|---:|
| National Press Bldg. Corp____ | 25 | $0.00 |
| New El Crest Mining Co_____ | 30,000 | 125.00 |
| Associated Press Bond_____ | _____ | 125.00 |
| Weston Elec. Instrument Corp_ | 100 | 3,672.43 |
| Bendix Corp_____ | 900 | 27,369.93 |
| Eastern Sugar (pfd.)_____ | 500 | 27,562.07 |

$58,854.43    $58,854.43

The Weston Electric, Bendix, and Eastern Sugar stocks were acquired as a temporary liquid investment of funds in nationally listed stocks with good dividend records, pending the maturity of installments of petitioner's obligations and interest thereon. These stocks were sold to help pay off the Bank of America loan.

During the years subject to review, petitioner paid no dividends. Petitioner was prohibited from paying dividends during said years by the provisions of the term loan agreement with the Bank of America covering the $400,000 obligation.

Petitioner was formed for the purpose of carrying on the business of publishing daily newspapers for profit and was not formed for the purpose of preventing the imposition of surtax upon its shareholders · or the shareholders of any other corporation through the medium of permitting earnings or profits to accumulate instead of being divided or distributed.

Petitioner was not availed of for the purpose of preventing the imposition of surtax upon its shareholders or the shareholders of any other corporation through the medium of permitting earnings or profits to accumulate instead of being divided or distributed.

Petitioner was an operating company engaged in the business of publishing daily newspapers and not a mere holding or investment company.

Petitioner properly accumulated earnings in anticipation of obligations to become due. Petitioner's earnings and profits were not permitted to accumulate beyond the reasonable needs of its business during the years subject to review.

OPINION.

*Issue No. 1.*

Respondent concedes "that amounts paid for an agreement not to compete are capital expenditures, and may be amortized ratably over the life of the agreement." He contends, however, that nothing more was transferred than good will in the sale of a going business and that the agreement must be regarded as nonseverable from the good will and hence not subject to deduction for depreciation, citing Regulations 111, section 29.23(1)–3; *Aaron Michaels*, 12 T. C. 17, 19; *Boonville National Bank*, 2 B. T. A. 352; *Toledo Newspaper Co.*, 2 T. C. 794; and *Toledo Blade Co.*, 11 T. C. 1079. Further, respondent contends, in effect, that even if the covenant is severable, nevertheless it has not been proven that anything had been paid for it.

The nub of the question is whether the agreement not to compete was actually dealt with as a separate item in the transaction and, if so, how much was paid for it. *Aaron Michaels, supra; Rodney B. Horton*, 13 T. C. 143.

Our findings of fact require us to decide this issue against respondent. The parties to the contract of sale were strangers to each other, dealing at arm's length. The sellers were adequately put on notice that a covenant not to compete was a *sine qua non* of the sale so far as the buyers were concerned. It also was made clear that the buyers were treating this item as a separate item and wanted an allocation of the price they were offering to be made between the stock and the covenant. This was done and the allocation asked by the buyers was specifically incorporated in the final written agreement. Perhaps the sellers gave inadequate consideration to what the tax consequences to them of such treatment of the purchase price might be and had such possibilities been fully appreciated more vigorous bargaining on the allocation might have resulted. Those are "iffy" questions and do not control the issue here.

The decisions cited by respondent are distinguishable. The *Toledo* cases involved the sale of intangibles only and it was found that the covenant was not severable from the good will. Here, all the outstanding stock of Gazette and Telegraph was sold. The stockholders were not selling the paper's good will as an item covered in the contract of sale. However, along with their shares of stock they did sell their own covenant not to compete as a separate item of the transaction and thus, as argued by petitioner, created new and valuable rights in the hands of the buyers which were bargained for, had a separate consideration, and a definite life, and so were subject to depreciation. The *Boonville National Bank* and *Aaron Michaels* cases likewise stand on their own facts and are distinguishable.

No point is made that the purchasers of the covenant not to compete could not have assigned the covenant to petitioner and we do not see how any such question could have been raised.

Decision will be entered for petitioner on issue No. 1.

*Issue No. 2.*

The issue here has been materially narrowed by respondent's concessions on brief. In his notice of deficiency respondent took the position that interest paid by petitioner on the notes issued by petitioner to the Bank of America set out in the findings of fact, which payments were in the amounts of $11,267.67 for 1947 and $11,528.17 for 1948, as well as amounts paid as interest on the $250,000 in notes to stockholders were not properly deductible as interest payments, but were actually distributions to shareholders. On brief, respondent has now conceded that the amounts paid to Bank of America were properly deductible. This would have justified elimination from our findings of fact of many of the complicated transactions with reference to the Bank of America loans. Nevertheless, we have determined to make our findings complete because of their bearing on the section 102 issue.

Issue No. 2 is thus narrowed to whether the $250,000 in notes which we have found petitioner issued to its shareholders were bona fide debts of petitioner. If they were, the interest paid thereon is properly deductible under section 23 (b).

Respondent strongly urges that petitioner has not met its burden of proof on this issue principally because the original notes were not introduced in evidence. Despite this omission there is abundant evidence in the record, unobjected to by respondent, to establish fully the terms of the notes, their issuance, the bona fides of the indebtedness, the reasons for the issuance of notes rather than shares of stock, the intent of the parties that a debtor-creditor relationship be the result of the transaction—in short, to establish an uncontradicted factual basis for concluding that the payments made were "interest" payments and not the distribution of dividends as argued by respondent.

The question of "thin" capitalization is raised by respondent, but if we bring in the Bank of America obligation the ratio of equity to indebtedness is approximately 1 to 2½ and if we count only the notes issued to shareholders that ratio is 1 to 1. We do not think this case can be made to rest on "thin" capitalization.

The question is essentially one of fact, *Tribune Publishing Co.*, 17 T. C. 1228. It having been found that the $250,000 in notes issued by petitioner represented bona fide indebtedness, decision on this issue will be for the petitioner.

*Issue No. 3.*

On the basis of the ultimate findings of fact on this issue, which involves the application of section 102, Internal Revenue Code,[1] it must also be decided in favor of petitioner.

The transactions with which we are here concerned are steps in the long career of R. C. Hoiles in assembling a chain of newspapers. Contentions somewhat similar to those here made by respondent were present in *Crawford County Printing & Publishing Co.*, 17 T. C. 1404, which involved the tax problems of another of the corporations used by Hoiles along the way to his business goal. The issue here arises under the same section of the Internal Revenue Code, and the fact situation, though different, calls for the same end result. The question there was whether petitioner, with planned expansion in view, could accumulate its earnings "until the expansion can be timely undertaken" without running afoul of section 102. We held that it could, "absent an ulterior purpose."

This is not a case like *World Publishing Co.* v. *United States*, 72 F. Supp. 886, cited by respondent, where it was held that accumulations were unreasonable "because of the adequacy of the previously accrued surplus and the necessary remoteness of the contemplated expansion at that time." In this proceeding we have before us the first two fiscal years of a corporation formed for the purpose of taking over a going newspaper business. It had no accrued surplus at its inception and the maturity of its obligations was not remote. Shortly after its organization in March 1946 it had indebtedness of some $400,000 to the Bank of America on a 5-year installment note due in 1951 and $250,000 in notes due to stockholders in 1956. During the years under review petitioner paid off $175,000 principal of the Bank of America loan and $22,795.84 interest thereon. It was paid off in its entirety by March 31, 1950.

No payments were made on the principal of the $250,000 notes issued to shareholders as part of petitioner's original capitalization during

---

[1] SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS.

(a) IMPOSITION OF TAX.—There shall be levied, collected, and paid for each taxable year * * * upon the net income of every corporation * * * if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following:

27½ per centum of the amount of the undistributed section 102 net income not in excess of $100,000, plus 38½ per centum of the undistributed section 102 net income in excess of $100,000.

 \*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(c) EVIDENCE DETERMINATIVE OF PURPOSE.—The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary.

the years before us. These notes were, however, retired by the end of March 1950, except for $18,100 due Register Publishing Company, Ltd., canceled in the merger of March 31, 1950, referred to in the findings of fact.

Petitioner argues that it was for the purpose of providing for the retirement of these obligations that it accumulated earnings and that such accumulation was reasonable. We agree. As we said in *Crawford County Printing & Publishing Co., supra:*

Determination of the reasonable needs of its business is, in the first place, a task for the officers and directors of the corporation. * * * We should be hesitant to attribute a sinister or ulterior motive to the corporation unless such a factual situation clearly appears.

We find no such factual situation here. True, petitioner accumulated a surplus of $97,633.06 in fiscal 1947 which had increased to $236,266.08 by the end of fiscal 1948 despite the payments on principal of the Bank of America note. Nevertheless, we think petitioner was entitled to anticipate the substantial amounts which would fall due on its obligations in the next few years, and that despite the encouraging results of its first 2 years of operations, section 102 did not require it to be an incorrigible optimist and distribute earnings, which unless good business continued, would surely be needed within 3 years to meet fixed maturities.

We note that the loan agreement with the Bank of America prohibited the distribution of dividends until the loan was repaid. Such an agreement is not controlling as to the applicability of section 102, but is simply a fact to be considered in determining whether the earnings or profits are permitted to accumulate beyond the reasonable needs of the business.

One other argument made by respondent calls for some comment. In discussing the motive for organizing the petitioner, respondent points out that R. C. Hoiles made a statement in one of his letters to Nowels concerning the proposed stock purchase that a new corporation was to be formed "in order to make it better from a tax standpoint." From this it is argued that the purpose must have been "to avoid the imposition of surtax upon its shareholders." The record however does not justify tainting the whole transaction because of this statement. There were bona fide business reasons, such as the expiration of the charter of the old corporation and the desire for broader corporate powers which entered into the organization of petitioner. Also, the purchasers of the shares of the old wanted to reduce their equity interest in the business. We can not find on the facts that the dominant motive in formation of petitioner was to avoid surtaxes.

On the record we think petitioner has proved by a clear preponderance of the evidence that its earnings or profits have not been allowed to accumulate beyond the reasonable needs of the business.

Accordingly, decision will be entered for the petitioner on issue No. 3.

Because other adjustments will have to be made in accordance with concessions by both parties,

*Decision will be entered under Rule 50.*

Reviewed by the Court.

TURNER and JOHNSON, *JJ.*, dissent.