Glendon Whitmore and Rene Whitmore v. Commissioner. Sam O. Whitmore and Lois M. Whitmore v. Commissioner.
Whitmore v. Commissioner
Docket Nos. 351-65, 408-65.
United States Tax Court
T.C. Memo 1966-244; 1966 Tax Ct. Memo LEXIS 38; 25 T.C.M. (CCH) 1243; T.C.M. (RIA) 66244; October 31, 1966
David E. Salisbury, for the petitioners in Docket No. 351-65. Dean E. Conder, Newhouse Bldg., Salt Lake City, Utah, for the petitioners in Docket No. 408-65. David R. Brennan and Roger A. Pott, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the year 1961 as follows: Docket
No.
Petitioner
Deficiency
351-65
Glendon and Rene Whit-
more
$2,215.86
408-65
Sam O. and Lois M. Whit-
more
905.10
The principal issue is whether any portion of the selling price of $60,000, specified in a sales contract between the respective petitioners, is properly allocable to a covenant not to compete contained therein. Secondary issues for determination in each docket relate to the disallowance *39 by respondent of travel and entertainment expense deductions claimed by petitioners. Several other adjustments in respondent's notices of deficiency were not raised in the petitions and, accordingly, are not before this Court for determination. Findings of Fact Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Glendon Whitmore (hereinafter referred to as Glendon) and Rene Whitmore, husband and wife, filed their joint Federal income tax return for the year 1961 with the district director of internal revenue, Salt Lake City, Utah. At the time this return was filed they were residents of Salt Lake City. They are presently residents of Long Beach, California. Sam O. Whitmore (hereinafter referred to as Sam) and Lois M. Whitmore, husband and wife, filed their joint Federal income tax return for the year 1961 with the district director of internal revenue, Salt Lake City, Utah. At all times relevant to this controversy they were residents of Salt Lake City. In 1956 petitioners organized and were equal shareholders in a corporation known as Hollywood Mufflers, a distributor *40 of automotive equipment. Glendon and Rene owned 50 percent of the stock, and Sam and Lois owned the remaining 50 percent of the shares. In the latter part of 1956 the organization acquired a franchise to distribute Midas mufflers and tailpipes (hereinafter referred to as the Midas franchise). In addition to handling Midas products, the corporation continued to distribute other lines of automotive equipment. The organization maintained three stores, two in Salt Lake City and one in Ogden, Utah. [1] At the request of the Midas organization, petitioners changed the name of their corporation, first to "Midas of Utah" and later to "Whitmore's, Inc." From the date of the original incorporation, until September 1, 1961, no change has occurred in the stock ownership of Whitmore's, Inc. [2]
Sometime prior to September 1, 1961, friction developed between Sam and Glendon, uncle and nephew, respectively, over the operation of the business. Sam retained the services *41 of an attorney, Arthur H. Nielsen (hereinafter referred to as Nielsen) and Glendon retained the services of the counsel for Whitmore's, Inc., Dan S. Bushnell (hereinafter referred to as Bushnell). A meeting was then held between the parties and their respective attorneys in an attempt to determine what could be done to resolve this friction. Resolution was found to be impossible. During this discussion the parties also rejected any arrangement whereby the business would be divided between them. Instead they agreed upon a plan whereby one of them would fix a price at which he would, at the option of the other party, either purchase the other party's stock or sell his own stock to the other party. In either case, this agreement would include the stock held by either Renee or Lois. During the discussion relevant to this purchase and sale device, no mention was made of a covenant not to compete. Neither party desired to set the price for the purchase or sale, so a coin was tossed and Sam, having lost the toss, agreed to do so. That evening and the next morning Sam and Nielsen conferred and settled upon a price of $60,000. In arriving at this figure they considered the following factors: *42 1. Financial statements of Whitmore's, Inc., as of July 31, 1961, as prepared by S. Bertell Bunker, the corporation's accountant. These statements revealed a net worth of $77,269.47. 2. Estimated corporate profits, from July 31 to the date of sale, of $3,000. These two figures were used to determine that the physical assets had a net value of $80,269.47. 3. The value of the Midas franchise, held by the corporation, which both Sam and Nielsen assumed to be either exclusive or restrictive. 4. The estimated going-concern value of the business. These four factors were used to determine the value that the stock would command on an open market. Nielsen suggested that a proper figure for a one-half interest might be found within a spread between $80,000 and $40,000. The $80,000 represented approximately 50 percent of a maximum going-concern value of the business and had been first suggested by Sam. The minimum figure, $40,000, was the approximate net book value of 50 percent of the physical assets, exclusive of the Midas franchise. Nielsen suggested a price of $70,000. In the course of their negotiations they settled on the aforementioned price of $60,000. In arriving at this *43 figure, no discussion was had with regard to a covenant not to compete. The $60,000 figure was submitted to Glendon through his attorney, Bushnell. After first indicating that the would sell at this price, Glendon finally stated that he would purchase the 50 percent interest of Sam and Lois. Sam agreed and Bushnell thereupon proceeded to prepare a draft of the agreement. This original draft provided in part: THIS AGREEMENT made and entered into by and between SAMUEL O. and LOIS WHITMORE hereinafter referred to as Sellers, and GLENN [Glendon] M. and RENEE WHITMORE, hereinafter referred to as Purchasers. WITNESSETH: WHEREAS, the above-mentioned parties have been the substantial stockholders of Whitmore's, Inc., d/b/a Midas Muffler Shops, and WHEREAS, the parties have determined that it would be for the best interests of the company that the Sellers sell and the Purchasers purchase all of the outstanding stock of the Sellers and to otherwise specify the terms of their agreement. NOW, THEREFORE, for and in consideration of the foregoing, other good and valuable consideration, and the mutual covenants, terms and conditions contained herein the parties agree as follows: *44 1. The Sellers hereby agree to sell and the Purchasers agree to purchase all of the outstanding stock owned by the sellers in Whitmore's, Inc., consisting of… shares represented by certificate Nos….. The purchase price for the same shall be the sum of $60,000.00 payable $5,000.00 down receipt of which is hereby acknowledged; the sum of $12,500.00 on or before the 15th day of October, 1961; and the balance in… monthly payments, the first payment commencing on the 1st day of January, 1962, and similar payments on or before the 1st day of each month thereafter. Interest shall be paid on all unpaid principal amounts at the rate of 6 1/2 per cent per annum. * * *
5. The Sellers agree that they will not directly or indirectly or otherwise enter into competition with the operations being conducted by Whitmore's, Inc., for a period of five years in the counties of Weber, Davis, Salt Lake and Utah counties in the State of Utah. Said restriction intends that the Sellers shall not as manufacturers representatives, wholesale agents, retail or otherwise engage in such competition nor shall they own any interest directly or indirectly, or have a beneficial interest in any company, *45 firm or association which engages in the same type of business. This draft of the agreement was sent to Nielsen, who, after conferring with Sam, made some minor changes and redrafted the form of the agreement. This second draft, though adding greater specificity to clause No. 1 of the original and renumbering the paragraphs, did not alter the substance of the original draft. It maintained the description that what was being sold was stock. This second draft was submitted to Bushnell who then made additional changes and submitted what was in fact the final draft of the agreement to Nielsen. In the interim between the receipt of the second draft by Bushnell and the acceptance of the final draft by both parties, Bushnell and Nielsen had a telephone conversation concerning certain changes which Bushnell desired to make in drafting the final agreement. These changes included making Whitmore's, Inc. a party to the sale and the relocation of the covenant not to compete in clause No. 1 and finally some grammatical changes. These changes were suggested by Bushnell after he had received certain independent tax advice. The reason for the relocation of the covenant in clause No. 1 was never *46 discussed with either Sam or Nielsen. Nielsen, under the assumption that the changes did not have any significant effect on the parties' agreement, agreed to them. The final agreement, executed September 1, 1961, provided in part as follows: THIS AGREEMENT made and entered into as of September 1, 1961, by and between SAMUEL O. and LOIS WHITMORE, hereinafter referred to as "Sellers", and GLENN [Glendon] M. and RENEE WHITMORE and WHITMORE'S, INC., hereinafter referred to as "Buyers". WITNESSETH: * * *
WHEREAS, the parties have determined that it would be for the best interests of the Company that the Sellers sell and the Buyers purchase all of the outstanding stock of the Sellers and a covenant not to compete and to otherwise specify the terms of their agreement, NOW, THEREFORE, for and in consideration of the foregoing, other good and valuable consideration, and the mutual covenants, terms and conditions contained herein the parties agree as follows: 1. The Sellers hereby sell and the Buyers hereby purchase all of the outstanding stock owned by the Sellers in Whitmore's. Inc., consisting of 6,600 shares represented by Certificate Nos. 2 and 4. And the Sellers further *47 agree that they will not directly or indirectly or otherwise enter into competition with the operations now being conducted by Whitmore's, Inc., for a period of five years in the counties of Weber, Davis, and Salt Lake in the State of Utah. Said restriction intends that the Sellers shall not as manufacturers, representatives, wholesale agents, retail or otherwise engage in such competition nor shall they own any interest directly or indirectly, or have a beneficial interest in any company, firm or association which engages in the same type of business. 2. The purchase price for the foregoing shall be the sum of $60,000.00 payable $5,000.00 down, receipt of which is hereby acknowledged; the sum of $12,500.00 on or before the 15th day of October, 1961; and the balance in twelve monthly payments including principal and interest, the first payment commencing on the 1st day of January, 1962, and similar payments on or before the 1st day of each month thereafter. Interest shall be paid on all unpaid principal amounts at the rate of 6 per cent per annum, all payments shall be applied first to the payment of interest and next to reduction of principal. The Buyers after January 1, 1962, may *48 at their option make any payments in excess of the monthly payments specified above and to the extent that any such additional payments are made, the Buyers then at their option may be relieved from any further monthly payments until such time as the advance payments are equal to the amount of payments which should have been paid during the period of such option as exercised by the Buyers. Sam and Lois treated the sale as involving merely the sale of their stock and reported the gain as capital gain on their 1961 Federal income tax return via the installment sale method. Whitmore's, Inc., one of the buyers, treated the purchase as involving both the stock and the covenant not to compete. It allocated the $30,000 paid by the corporation between the two items as follows: $3,300 for the 3,300 shares of stock at $1 par, and $26,700 for the covenant not to compete. The corporation treated the cost allocable to the covenant as amortizable over a sixty-month period, the life of the covenant. The corporation, therefore, took an amortization deduction of $1,779 for the year 1961. Since the corporation had, for the taxable year 1961, elected to be taxed as a small business corporation *49 under section 1371 of the Internal Revenue Code of 1954, its deduction, as part of an over-all loss sustained by the corporation for that year, was passed on to the shareholders, Glendon and Renee, who deducted the loss on their joint Federal income tax return for 1961. Respondent in his notices of deficiency determined the tax consequences of the above transaction adversely to each petitioner. In Docket No. 408-65 respondent determined that Sam had received ordinary income as to that portion of the receipts for 1961 allocable to the covenant not to compete. In Docket No. 351-65 respondent determined that the corporation had improperly deducted amortization of the covenant in computing the loss sustained by it. Respondent concluded that the corporate loss claimed by Glendon by virtue of the subchapter S provisions should be reduced accordingly. Respondent, however, in recognition of his inconsistent position, appeared as a "stakeholder" on this issue and sought merely that the parties treat the transaction consistently. Also during the taxable year 1961, both Sam and Glendon incurred an indeterminate amount of travel and entertainment expenses in connection *50 with the operation of the business. The major portion of these expenditures was for the cost of customer lunches and related entertainment. During the year in question Sam made numerous trips each week to Ogden and Provo, Utah, to check on the business and to see clients. Glendon, during this period, also traveled frequently throughout Utah and Idaho contacting and entertaining various persons concerning the prospect of their stocking the products of Whitmore's, Inc. Each petitioner received from the corporation the sum of $35 per month as an expense account. Glendon also testified that his expenses invariably exceeded the monthly allowance. Both offset the allowances against their alleged expenses and did not report the allowances as income on their respective returns. Respondent in his statutory notices of deficiency determined that the allowances received by Sam ( $315) and Glendon ( $420) were to be added to their respective incomes inasmuch as they had not furnished verification as to any allowable expenses. Opinion The primary issue for decision is whether any portion of the contract price was allocable to the covenant not to compete. The solution depends upon whether the *51 parties actually treated the covenant as an independent item and whether the buyer actually paid anything for the covenant. Lee Ruwitch, 22 T.C. 1053 (1954); Clarence Clark Hamlin Trust, 19 T.C. 718 (1953), affd. 209 F. 2d 761 (C.A. 10, 1954); Gazette Telegraph Co., 19 T.C. 692 (1953), affd. 209 F. 2d 926 (C.A. 10, 1954). The rule is well settled that if the covenant was treated in a separate and distinct manner and if the parties intended that a portion of the total consideration be allocated to it, then the seller must treat that portion of the consideration as giving rise to ordinary income and the buyer may amortize the cost of the covenant ratably over its useful life. Howard Construction, Inc., 43 T.C. 343 (1964), and the cases cited therein. It is equally well settled that if the consideration is merely in payment for the fair market value of the stock sold, then the seller is entitled to capital gain treatment and the buyer is denied any amortization deduction. See Carl L. Danielson, 44 T.C. 549 (1965). The intention of the parties is a factual issue to be determined in light of *52 all the evidence with primary emphasis on the written agreement. Benjamin Levinson, 45 T.C. 380 (1966). In the instant case we believe it to be significant that, in the contract as finally executed, no amount was allocated to the covenant not to compete. This fact when viewed against the background of the negotiations between the parties provides persuasive evidence that no such allocation was ever intended. During the negotiations no discussion was ever carried on with reference to the value of the covenant. Nor in the first two drafts of the agreement was the covenant considered as anything but a routine clause. It had first been included, without prior discussion, by Bushnell. As it appeared in the preliminary drafts, it was in no way related either to the description of what was being sold or to the recital of consideration. As originally posed and throughout the preliminary drafts, the $60,000 consideration was stated to be solely in exchange for the 6,600 shares of Whitmore's, Inc. stock. Sam, in arriving at the price term contained in the contract, had considered solely the fair market value of the stock without any reference to the covenant. Indeed, up to *53 the time at which the price was set, the parties had never discussed a covenant as part of the agreement. We are of the opinion that this history of the negotiations and the preliminary drafts of the agreement are highly persuasive evidence that the parties did not treat the covenant as an independent item and did not intend that any portion of the consideration was to be allocated to it. Glendon, however, places great stress upon the fact that in the final agreement the covenant was listed as one of the items being sold. This we find, on the particular facts before us, to have little or no value in revealing the intention of the parties. This change in the form of the contract was agreed to during a telephone conversation in which there was no discussion as to the reason for it. Glendon and Bushnell did not communicate to Nielsen their desire that the covenant be treated independently. In fact, Nielsen agreed to these changes only on the assumption that they had no substantive effect on his client and were merely changes in form. In these circumstances we cannot attribute any significant weight to the buyer's unilateral and unexpressed intention that the covenant be treated independently. *54 See Annabelle Candy Co. v. Commissioner, 314 F. 2d 1 (C.A. 9, 1962), affirming a Memorandum Opinion of this Court. We believe it to be fairly inferable from the above facts that one of the reasons for this lack of communication was the fear that the sellers, if fully informed, would not consent to the change. In view of the foregoing, we believe that the parties, at the time they executed the contract of sale, did not intend to treat the covenant as a distinct item and consequently did not allocate any portion of the consideration to it. We hold, therefore, that the evidence clearly indicates that no part of the consideration was paid for the covenant not to complete. The final issues for determination relate to the disallowances by respondent, for lack of verification, of travel and entertainment expenses claimed by Sam in the amount of $315 and by Glendon in the amount of $420. At the trial both Sam and Glendon were unable to introduce specific records as to the amounts actually expended during the year for travel and entertainment. They did, however, introduce evidence as to the general extent of their travels and the general nature of the entertainment expenditures *55 for the year 1961. In estimating the costs of these expenses we have employed the approximation method as prescribed by Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). After consideration of this evidence, particularly noting the frequency of these trips, we have concluded that petitioners' claims are allowable as reasonable travel and entertainment expenses in the following amounts: $250 is allowable to Sam and $335 is allowable to Glendon. Decisions will be entered under Rule 50. Footnotes
1. A fourth store in Provo, Utah, was operated for a time but appears to have been abandoned. ↩
2. Actually, one share of stock is owned by one Blaine M. Harmon, with the petitioners owning the balance of 13,200 shares equally.↩