HOWARD CONSTRUCTION, INC., ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 93034–93036, 93116, 93172, 94403, 738–63. Filed December 29, 1964.

---

[1] Proceedings of the following petitioners are consolidated herewith : George Floyd Jones, Jr., and Mary Rose Jones, docket No. 93035 ; George Floyd Jones, Sr., and Esther G. Jones, docket No. 93036 ; Glenn L. Squires and Ann Louise Squires, docket No. 93116 ; Joseph S. Farland and Virginia C. Farland, docket No. 93172 ; Howard Construction, Inc., docket No. 94403 ; and Investors Loan Corp., docket No. 738–63.

*Louis F. Tanner* and *Charles S. Armistead*, for the petitioners in docket Nos. 93034, 93035, 93036, 93116, 93172, and 94403.

*Jacques T. Schlenger* and *Frederick Steinmann*, for the petitioner in docket No. 738–63.

*John J. Larkin*, for the respondent.

DRENNEN, *Judge:* In these consolidated proceedings respondent determined deficiencies in income tax as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 93034 | Howard Construction, Inc. | 1957 | [1] $1,938.19 |
| 93035 | George Floyd Jones, Jr., and Mary Rose Jones | 1957 | 493.68 |
| 93036 | George Floyd Jones, Sr., and Esther G. Jones | 1957 | 477.93 |
| 93116 | Glenn L. Squires and Ann Louise Squires | 1957 | 2,751.12 |
| 93172 | Joseph S. Farland and Virginia C. Farland | 1957 | 12,126.21 |
| 94403 | Howard Construction, Inc. | Taxable year ended Mar. 31, 1958. | [1] 1,938.19 |
| 738–63 | Investors Loan Corp. | Taxable year ended: Sept. 30, 1958 | 4,775.02 |
| | | Sept. 30, 1959 | 10,598.09 |
| | | Sept. 30, 1960 | 13,429.17 |
| | | Sept. 30, 1961 | 4,566.44 |

[1] It will be noted that respondent has issued two notices of deficiency to Howard Construction, Inc., one in docket No. 93034 ostensibly relating to the calendar year 1957, and one in docket No. 94403, relating to the fiscal year ended Mar. 31, 1958. The amounts of the deficiencies determined in both notices are the same, and it is apparent from the notices that respondent's determinations in both dockets have the same basis. In the pleadings respondent has admitted that the reference in the notice of deficiency in docket No. 93034 to the calendar year 1957 is merely a clerical error. Thus, the taxable year ended Mar. 31, 1958, is correctly shown in the notice in docket No. 94403. While the parties do not discuss the point on brief, and neither party has filed a motion to dismiss in either docket, it seems obvious that the notice of deficiency in docket No. 93034 was erroneously issued or that it was issued for protective purposes until the proper taxable year could be ascertained. But in view of our conclusions herein this duplication will be of no consequence.

There are two issues for decision, both arising from a transaction of October 18, 1957, in which the stockholders of Colonial Loan Co., including petitioners Howard Construction, Inc., George Floyd Jones, Sr., George Floyd Jones, Jr., Glenn L. Squires, Joseph S. Farland, and Virginia C. Farland, sold all of the stock of that corporation to petitioner Investors Loan Corp. under a written agreement in which a consideration of $16.60 per share was stated and in which the stockholders of Colonial Loan Co., with certain exceptions, agreed not to compete in the management of a loan company in competition with petitioner Investors Loan Corp.

The first issue is whether any portion of the stated consideration for the stock of Colonial Loan Co. is to be allocated to the selling stockholders' covenant not to compete with the buyer, with the result that such an allocated amount represents ordinary income to the selling

stockholders and with the result that petitioner Investors Loan Corp. is entitled to deductions for amortization of the cost of the covenant over the period of its proven term.

The second issue, posed by the amended petition filed by Investors Loan Corp., is whether any portion of the stated consideration is allocable to premiums paid for loan accounts, with the result that Investors Loan Corp. is entitled to deductions for amortization of the cost of such premiums.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner Investors Loan Corp. (hereafter called Investors) is a corporation organized in 1946 under the laws of Maryland with its principal office in Frederick, Md. Through its subsidiaries it is engaged primarily in the small loan business under the applicable loan laws of the States of Maryland, Pennsylvania, Virginia, West Virginia, and North Carolina. It filed Federal income tax returns for the taxable years 1958, 1959, 1960, and 1961, on the basis of a fiscal year ended September 30, with the district director of internal revenue, Baltimore, Md.

Petitioner Howard Construction, Inc., was a corporation organized under the laws of West Virginia with its principal office in Morgantown, W. Va.[2] It filed its Federal income tax return for the taxable year ended March 31, 1958, with the district director of internal revenue, Parkersburg, W. Va.

The two petitioners in each of docket Nos. 93035, 93036, 93116, and 93172, are husband and wife, respectively, all residing in Morgantown, W. Va. Each husband and wife filed a joint income tax return for the taxable year 1957 with the district director of internal revenue, Parkersburg, W. Va.

Colonial Loan Co. (hereafter referred to as Colonial) is a corporation incorporated in 1953 under the laws of West Virginia. On October 18, 1957, Colonial owned 100 percent of the issued and outstanding stock of Colonial Loan Co. of Martinsburg, Inc. (hereafter referred to as Colonial of Martinsburg), and of Colonial Loan Co. of Weirton, Inc. (hereafter referred to as Colonial of Weirton).

Colonial of Martinsburg was incorporated under the laws of West Virginia in 1953. Colonial of Weirton was incorporated under the laws of West Virginia in 1955.

From the dates of their incorporation through September 30, 1961, Colonial, Colonial of Martinsburg, and Colonial of Weirton each en-

---

[2] It was alleged in the pleadings that Howard Construction, Inc., was dissolved as a corporation on May 9, 1958. This allegation has been denied by respondent. The petitions in both docket Nos. 94403 and 93034 were filed in the name of Howard Construction, Inc. The authority of Howard Construction, Inc., to proceed here is undisputed.

gaged primarily in the small loan business under the applicable laws of West Virginia in the areas of Morgantown, Martinsburg, and Weirton, respectively.

On October 18, 1957, there were issued and outstanding 21,550 shares of the common stock of Colonial, representing all of the issued and outstanding stock of that corporation, which were owned as follows (according to the stipulation of facts):

| Stockholder | Number of shares |
|---|---|
| Edwin H. Camp | 3,544 |
| Joseph S. Farland | 4,000 |
| Virginia C. Farland | 4,269 |
| Howard Construction, Inc | 2,253 |
| George F. Jones, Jr | [1] 2,000 |
| F. O. Kendall | 50 |
| William S. Leyhe | 1,200 |
| Julius W. Singleton, Jr | 590 |
| Glenn L. Squires | 3,544 |
| C. Glenn Zinn | 100 |
| Total | 21,550 |

[1] The notices of deficiency issued to George F. Jones, Jr., and George F. Jones, Sr., were based on a determination that each owned 1,000 shares of the stock of Colonial. In the pleadings it was also alleged that each owned 1,000 shares of the stock. In his answers respondent denied generally all allegations of facts. It has been stipulated that George F. Jones, Jr., owned 2,000 shares of stock and George F. Jones, Sr., does not appear on the stipulated list of stockholders. If George F. Jones, Sr., did not beneficially own any shares of stock of Colonial, we discern no basis for respondent's determination of a deficiency in docket No. 93036. The parties do not discuss this point on brief, and the record discloses no indication that George F. Jones, Sr., beneficially owned any of the stock of Colonial. In view of our decisions herein, it is unnecessary to reconcile the point.

In 1957, Gwynn X. Kinsey (hereafter referred to as Kinsey) was vice president of Investors which was then operating small loan offices in Maryland, Virginia, and Pennsylvania. He first met William Leyhe (hereafter referred to as Leyhe), president of Colonial, when Leyhe casually visited his office in Frederick, Md., in June 1957.

On the morning of October 17, 1957, Leyhe called on Kinsey at the office of Investors in Frederick. Leyhe told Kinsey that the stockholders of Colonial were considering selling the company, and Leyhe asked if Investors would be interested in buying the business. Kinsey replied that Investors would be interested. Leyhe also said that the stockholders of Colonial were discussing a sale to a small loan company in Pittsburgh, Pa., and that a sale might be consummated within the next few days. Kinsey and Leyhe thereupon drove to Morgantown, W. Va., in Leyhe's automobile. During the trip, Leyhe recounted his experience in the small loan business as well as the formation of Colonial by Joseph S. Farland (hereafter referred to as Farland).

Kinsey and Leyhe arrived in Morgantown shortly after noon on October 17, and they went to the loan offices of Colonial where Kinsey made a cursory examination of the loan account records of Colonial and its subsidiaries and where he reviewed generally the operations of Colonial.

Later Leyhe took Kinsey to the headquarters office of Colonial in the Monongahela Building in Morgantown. Glenn L. Squires (hereafter referred to as Squires), a stockholder of Colonial, maintained an office in the same building, and Kinsey met Squires on the afternoon of October 17, 1957, either at Squires' office or at the office of Louis F. Tanner (hereafter referred to as Tanner), a certified public accountant with offices in the same building. Squires had been asked by the Farlands to attempt to find a buyer for their stock in Colonial. Tanner was to represent the stockholders generally in any sale of their stock of Colonial. Kinsey explained to Squires or to Tanner or both of them on the afternoon of October 17 that Investors was interested in purchasing the stock of Colonial and that he felt that an agreeable price for the stock could be negotiated in a short time.

At the headquarters office of Colonial, Kinsey was given financial statements for Colonial, including monthly income statements. Kinsey, a certified public accountant, prepared a consolidated balance sheet for Colonial and its subsidiaries and arrived at a price which he was to offer for the Colonial shares. Kinsey had been told by Leyhe that the potential purchaser of the Colonial stock in Pittsburgh had offered tentatively to purchase the Colonial stock, or the assets of Colonial, at a price which would reflect a premium for Colonial's notes receivable. Kinsey kept this information in mind when he appraised the notes receivable of Colonial and determined that, on behalf of Investors, he would offer to buy the stock of Colonial at a price which would reflect an appraisal of notes receivable at 132 percent to take into account goodwill, prepaid expenses, unearned interest, and any assets of Colonial which did not appear on the consolidated balance sheet. Also, he determined from the consolidated balance sheet that Colonial had made an investment in a subsidiary in excess of the book value of the stock of the subsidiary in the amount of $45,000, which was reflected on the consolidated balance sheet as goodwill. Kinsey decided that this asset should be valued at zero in determining the value of the stock of Colonial. He made a computation of the price which he was to offer the stockholders of Colonial for their shares, based upon his appraisal of the underlying assets of Colonial and of its subsidiaries, which appraisal was in turn based upon Kinsey's consolidated balance sheet.

The following is a reproduction of Kinsey's computations:

CONSOLIDATED STATEMENT, SEPTEMBER 30, 1957

| | Per books Sept. 30, 1957 | Appraised values | Basis of appraisal |
|---|---|---|---|
| Cash | $17,215.96 | $17,200.00 | Book. |
| Receivables | 456,380.46 | 602,400.00 | 132 percent. |
| Goodwill—Martinsburg | 45,000.00 | 0 | |
| Furniture and fixtures | 18,149.50 | 18,200.00 | Book. |
| Other assets | 3,082.28 | 3,100.00 | Do. |
| Total assets | 539,828.20 | 640,900.00 | |
| A/c payable | 2,779.11 | 2,800.00 | |
| Notes pay—banks | 230,000.00 | 230,000.00 | |
| Notes pay—other | 36,000.00 | 36,000.00 | |
| Provision for taxes | 9,750.00 | 9,750.00 | |
| Other liabilities | 10.35 | | |
| Reserve for losses | 16,687.59 | 0 | |
| Total liabilities | 295,227.05 | 278,550.00 | |
| Capital: | | | |
| Common stock | 215,500.00 | | |
| Surplus—consolidated | 29,101.15 | | |
| Total capital | 244,601.15 | | |
| Total capital as computed | | 362,500.00 | |
| Price per share | | 36.25 | |

$$2155\sqrt{\begin{array}{r} 16.82 \\ \hline 36250 \\ 2155 \\ \hline 14700 \\ 12930 \\ \hline 1770 \end{array}}$$

At about 5:30 on the afternoon of October 17, Kinsey and Leyhe went to Tanner's office to discuss the proposed sale. Squires was present at the meeting.

Possibly Kinsey had made a tentative offer for the Colonial stock of $16.82 per share to Squires and Leyhe earlier in the afternoon, but in any event, Kinsey for the first time made an offer to Tanner to purchase the stock at $16.82 per share on the evening of October 17. Kinsey showed Tanner the foregoing computations upon which his offer was based.

Tanner noted that the liabilities shown on the consolidated balance sheet amounted to approximately $278,550. Tanner explained that the liabilities shown on the financial statements given Kinsey did not reflect certain expenses Colonial had incurred but which were as yet unbilled. One expense was for auditing services rendered Colonial by Tanner's firm. Tanner told Kinsey that, because of these liabilities not reflected on the consolidated balance sheet, the stockholders of Colonial could not guarantee liabilities of Colonial and of its subsidiaries to be $278,550. Tanner suggested that instead of the stockholders of Colonial discharging any of Colonial's liabilities the selling stockholders should simply guarantee liabilities to be not in excess of

about $283,000, and the offer for the stock should be reduced accordingly. Tanner pointed out that if the transaction were handled in this manner Colonial would get the tax benefit of deductions for the unbilled expenses. Kinsey concurred and he and Tanner arrived at an adjusted offering price of $16.60 per share for the stock of Colonial.

Tanner considered the offer of $16.60 per share to be firm, and he telephoned two stockholders of Colonial who were not in Morgantown to convey the offer to them and to ask for telegrams which would authorize him to enter into an agreement for the sale of their stock in Colonial to Investors. Tanner telephoned Julius W. Singleton in Huntington, W. Va., and Farland, then U.S. Ambassador to the Dominican Republic, in Ciudad Trujillo.

Tanner received a telegram from Singleton at 7:56 on the evening of October 17, authorizing Tanner to represent him in the proposed sale. Tanner also received a telegram from the Farlands early on the morning of October 18 authorizing him to represent them.

Kinsey met with Squires, Tanner, and Tanner's son and partner in Tanner's office early on the morning of October 18, 1957. As the meeting progressed, other stockholders of Colonial visited the office from time to time. Kinsey had assured Leyhe that Investors would employ Leyhe if the Colonial stock was purchased and Kinsey had asked Leyhe to recommend a local lawyer who would prepare the agreement of sale. Leyhe had suggested Charles H. Haden whose offices were near those of Tanner.

Tanner telephoned Haden and asked that he come to Tanner's office to get information for an agreement which the parties wanted Haden to prepare. Haden proceeded to Tanner's office where Kinsey and Tanner told him that Investors was purchasing the stock of Colonial at a price of $16.60 per share from stockholders whose names were given him.

Haden took the information to his office, dictated a draft of the agreement, and returned to Tanner's office in about one-half hour.

Squires left the meeting to telephone the proposed purchaser in Pittsburgh to say that the stockholders of Colonial were selling their shares to Investors, primarily because Leyhe was to be employed by Investors.

When Haden returned with the draft of the agreement, it was reviewed by Tanner and Kinsey. Haden, or possibly Kinsey, asked whether a covenant by the sellers not to compete with Investors after the sale should be included in the written agreement. There was

some discussion concerning such a covenant but the representatives of the sellers said they had no objection to including such a covenant in the agreement because the sellers had no intention of going back into the small loan business anyway. However, Tanner's son pointed out that certain of the selling stockholders should be excluded from application of a covenant not to compete because one stockholder was in the industrial banking business; another was an officer in a local bank; and Leyhe would be continuing in the business. Kinsey agreed that these stockholders should be excluded from the covenant.

Haden returned to his office and drafted another agreement which provided as follows:

THIS AGREEMENT, Made this the 18th day of October, 1957, by and between EDWIN H. CAMP, JOSEPH S. FARLAND, VIRGINIA C. FARLAND, HOWARD CONSTRUCTION, INC., a corporation, GEORGE F. JONES, JR., F. O. KENDALL, WILLIAM S. LEYHE, JULIUS W. SINGLETON, JR., GLENN L. SQUIRES and C. GLENN ZINN, parties of the first part, and INVESTORS LOAN CORPORATION, a Maryland corporation, party of the second part.

WHEREAS, The parties of the first part are the owners of the following number of shares of the outstanding capital stock of Colonial Loan Company, a corporation organized and existing under the laws of the State of West Virginia:

| | |
|---|---:|
| Edwin H. Camp | 3,544 Shares |
| Joseph S. Farland | 4,000 Shares |
| Virginia C. Farland | 4,269 Shares |
| Howard Construction, Inc. | 2,253 Shares |
| George F. Jones, Jr. | 2,000 Shares |
| F. O. Kendall | 50 Shares |
| William S. Leyhe | 1,200 Shares |
| Julius W. Singleton, Jr. | 590 Shares |
| Glenn L. Squires | 3,544 Shares |
| C. Glenn Zinn | 100 Shares |
| TOTAL | 21,550 Shares |

the same being all of the outstanding capital stock of said corporation; and,

WHEREAS, The party of the second part desires to purchase all of the outstanding capital stock of said Colonial Loan Company, a corporation;

NOW, THEREFORE, THIS AGREEMENT WITNESSETH: That the said parties of the first part hereby agree to sell, and the said party of the second part agrees to purchase, all of the capital stock of Colonial Loan Company, a corporation, at Sixteen Dollars and Sixty Cents ($16.60) per share, paid and to be paid as follows:

Fifty Thousand Dollars ($50,000.00) to be deposited with the Farmers' and Merchants' Bank, in Morgantown, West Virginia, in escrow, upon the execution and delivery of these presents; the balance of Three Hundred Seven Thousand,

Seven Hundred Thirty Dollars ($307,730.00) to be paid on or before the 8th day of November, 1957. It is agreed by the parties hereto that pending the payment of the balance of the purchase price, the certificates of stock owned by the parties of the first part shall be properly endorsed and placed in escrow with the Farmers' and Merchants' Bank, together with said deposit and the stock transfer book of the corporation, the same to be held by the Farmers' and Merchants' Bank for delivery to the party of the second part upon the payment of said remaining balance of $307,730.00.

The parties of the first part, jointly and severally, guarantee that the liabilities of Colonial Loan Company do not exceed Two Hundred Eighty-Three Thousand, Three Hundred Seventy Dollars ($283,370.00). Said figure includes the Federal income tax liability accrued to June 30, 1957. Should it hereafter be ascertained that said liabilities exceed said amount as of September 30, 1957, then the parties of the first part agree to be jointly and severally liable for any excess.

As part of the consideration for the purchase of said stock, the said parties of the first part covenant and agree that they will not participate in the management of any loan company operating under the Small Loan Law of the State of West Virginia in competition with the party of the second part. Provided, however, that this provision shall not apply to Edwin H. Camp, C. Glenn Zinn and William S. Leyhe.

The said party of the second part shall be entitled to take possession of the books and records of the Colonial Loan Company and to begin operation of the business as of the date of the execution of these presents.

Time is of the essence of this agreement. Failure of the party of the second part to pay the balance of said purchase price of said stock on or before the 8th day of November, 1957, shall give the parties of the first part the right, at their option, to declare said deposit forfeited, and this agreement shall become null and void and all books and records of Colonial Loan Company shall be immediately returned to the parties of the first part.

This agreement is executed on behalf of Joseph S. Farland, Virginia C. Farland and Julius W. Singleton, Jr. by Louis F. Tanner by authority duly given, and is executed upon behalf of Edwin H. Camp by William S. Leyhe by authority duly given:

WITNESS The following signatures and seals: and, [Signatures omitted.]

Tanner had requested written authorization for Kinsey to execute the agreement on behalf of Investors, and the secretary of Investors sent Tanner a telegram containing such authorization. The telegram merely recited that Kinsey was authorized to purchase the Colonial stock at a price not to exceed $16.60 a share.

Kinsey executed the agreement on behalf of Investors; Tanner executed it on behalf of those stockholders from whom he had authority; and other stockholders in Morgantown came to Tanner's office during the day to execute it.

Under date of November 30, 1957, Kinsey entered the transaction on the books of Investors by the following entries:

| Date 1957 | Items | Debits | Credits |
|---|---|---|---|
| Nov. 30 | Cost of acquiring new loans and payments under operating agreements not to compete_____ Goodwill_____ Investment in subsidiary companies_____ | $68,662.17 45,967.24 243,100.59 | |
| | Transaction to record purchase of Colonial Loan Co_____ | | $357,730 |

*To record the assets and deferred charges purchased on Nov. 8, 1957 from the stockholders of Colonial Loan Co.*

(1) Value of consolidated net assets as of Oct. 31, 1957:
Net assets in the aggregate are equal to 125 percent of installment notes receivable.

| | | |
|---|---|---|
| Notes receivable at Oct. 31, 1957 were_____ | $453,221.91 | |
| 125 percent equals total net assets or_____ | 566,527.39 | |
| Less outstanding debts_____ | 277,459.56 | |
| True value of common stock_____ | 289,067.83 | |

(2) As of Oct. 31, 1957 the net worth of the company per its books was—

| | |
|---|---|
| Capital stock_____ | $215,500.00 |
| Surplus_____ | 27,600.59 |
| Total per books_____ | 243,100.59 |

The difference between this net worth and the true net worth ((1) above) represents goodwill_____ 45,967.24

289,067.83

(3) The excess of the cost of stock ($357,730 less $289,067.83) over its actual value, in the amount of $68,662.17, has been assigned to the expense in acquiring these new loans and the noncompete clause written into the purchase contract.

(4) In summary the company purchased:

| | |
|---|---|
| Capital stock and surplus_____ | $243,100.59 |
| Goodwill_____ | 45,967.24 |
| Noncompete agreement and cost of new loan___ | 68,662.17 |
| Total_____ | 357,730.00 |

Kinsey considered that Investors had paid book value for the stock of Colonial except that it had paid a premium for the notes receivable. To the extent that Investors had valued the notes receivable at 125 percent, Kinsey considered that Investors had paid for goodwill. Any excess amount paid by Investors for the stock of Colonial was deemed by Kinsey to be attributable to the cost of a covenant not to compete or to the costs of new loans or to both, but, in any event, the excess was considered by Kinsey to be amortizable over a period of 36 months.

On its Federal income tax returns, Investors claimed the following deduction for amortization based upon Kinsey's book entries:

| Taxable year ended Sept. 30— | Deduction for amortization of cost of acquiring new loan offices, including cost of leaseholds, development costs, etc. | Deduction for payments under operating agreements not to compete |
|---|---|---|
| 1958_____ | $7,629.52 | $3,814.18 |
| 1959_____ | 15,259.02 | 7,628.37 |
| 1960_____ | 0 | 22,887.39 |
| 1961_____ | 0 | 11,443.69 |
| | 22,888.54 | 45,773.63 |

Respondent has determined that Investors is not entitled to the foregoing deductions. The deficiencies in docket No. 738-63 result from this determination.

Howard Construction, Inc., the Farlands, the Squireses, George Floyd Jones, Jr., and George Floyd Jones, Sr., reported amounts received from Investors under the agreement of October 18, 1957, as long-term capital gain from the sale of their stock of Colonial. Respondent determined that, of the amounts paid by Investors to the stockholders under the agreement, the following amounts represent ordinary income as payments for a covenant not to compete:

| Stockholders | Amount |
|---|---|
| Howard Construction, Inc | $7,178.46 |
| Joseph S. and Virginia C. Farland | 26,346.52 |
| George Floyd Jones, Jr | 3,186.18 |
| George Floyd Jones, Sr | 3,186.18 |
| Glenn L. Squires | 11,291.82 |
| Total | 51,189.16 |

The foregoing amounts determined by respondent to have been received by the selling stockholders who are petitioners herein total more than the amounts claimed by Investors as the cost of a covenant not to compete, but respondent has represented on opening statement that his determinations herein are inconsistent and are in the alternative, and that, if we find that no amount paid by Investors is properly attributable to the covenant not to compete, we should find that no portion of the amounts paid by Investors represents ordinary income to the other petitioners.

ULTIMATE FACTS

The stockholders of Colonial sold their shares of stock to Investors under the agreement of October 18, 1957, for $16.60 per share. No portion of the amounts paid by Investors to the stockholders is properly attributable to a covenant not to compete.

Investors has failed to prove that any part of the amounts it paid the stockholders of Colonial for their stock represented the costs of acquiring loans, loan offices, leaseholds, development costs, or other intangibles other than goodwill.

OPINION

Pursuant to an agreement of October 18, 1957, the stockholders of Colonial sold all their stock in that corporation to Investors. Of the selling stockholders, six are petitioners in these proceedings: Howard Construction, Inc., George Floyd Jones, Sr., George Floyd Jones, Jr., Joseph S. Farland, Virginia C. Farland, and Glenn L. Squires. There were other stockholders of Colonial, and three of them did not enter into the covenant not to compete which is under review and are not

directly involved as parties herein. The purchaser of the stock, Investors, is also a party.

The first issue is concerned with the covenant not to compete which was included in the agreement of October 18, 1957. Petitioners assume divergent views with respect to the legal effect of the covenant. On the one hand, the selling stockholders contend that all amounts they received from Investors under the agreement of October 18, 1957, constitute receipts for the sale of their stock. They therefore maintain that they are entitled to long-term capital gains treatment on any amounts received from Investors. On the other hand, Investors maintains that some amount of the total consideration recited in the agreement should properly be allocated to the cost of the covenant not to compete.

Respondent has made inconsistent determinations and stands neutral on the question. Petitioners' cases have been consolidated in order to afford the opportunity to consider the varying versions of the transaction after one hearing and to reach a consistent result with respect to all petitioners. See *Ray H. Schulz*, 34 T.C. 235 (1960), affirmed sub nom. *Commissioner* v. *Landen*, 294 F. 2d 52.

From the viewpoint of Investors, any amount which it paid the selling stockholders which constitutes the cost of a covenant not to compete may be amortized for Federal income tax purposes over the life of the covenant, an intangible asset. As we said in *United Finance & Thrift Corporation of Tulsa*, 31 T.C. 278 (1958), affd. 282 F. 2d 919, certiorari denied 366 U.S. 902:

It is well settled that if, in an agreement of the kind which we have here, a covenant not to compete can be segregated as opposed to other items transferred in the overall transaction, and we can be assured that the parties in good faith and realistically have treated the covenant in a separate and distinct manner with respect to value and cost so that a severable consideration for it can be shown, the purchaser is entitled to amortize the price for the covenant paid ratably over the life of the covenant. *Francis Silberman*, 22 T.C. 1240 (1954), and cases cited therein; *B. T. Babbitt, Inc.*, 32 B.T.A. 693, 696 (1935); *Eitingon-Schild Co. and Subsidiaries*, 21 B.T.A. 1163 (1931); *Farmers Feed Co. of New York*, 17 B.T.A. 507 (1929). See also *Rodney B. Horton*, 13 T.C. 143 (1949), appeal dismissed on petitioner's (Commissioner's) motion, 180 F. 2d 354 (C.A. 10, 1950); *Gazette Telegraph Co.* v. *Commissioner*, 209 F. 2d 926 (C.A. 10, 1954), affirming 19 T.C. 692 (1953); *Hamlin's Trust* v. *Commissioner*, 209 F. 2d 761 (C.A. 10, 1954), affirming 19 T.C. 718 (1953).

But from the viewpoint of the other petitioners who sold their stock of Colonial, any amount which was paid to them for a covenant not to compete would be deemed ordinary income and would not qualify for long-term capital gains treatment.

Consequently, the interests of the purchaser and of the sellers are in opposition herein and were antithetical during the negotiations for the sale of the stock. *Ullman* v. *Commissioner*, 264 F. 2d 305, affirming 29 T.C. 129 (1957).

The factual issue with which we are confronted has been phrased in *Gazette Telegraph Co.*, 19 T.C. 692 (1953), affd. 209 F. 2d 926, as follows:

The nub of the question is whether the agreement not to compete was actually dealt with as a separate item in the transaction and, if so, how much was paid for it. *Aaron Michaels* * * * [12 T.C. 17]; *Rodney B. Horton*, 13 T.C. 143.

See also *Annabelle Candy Co.* v. *Commissioner*, 314 F. 2d 1, affirming a Memorandum Opinion of this Court; *North American Loan & Thrift Co. No. 2*, 39 T.C. 318 (1962), affirmed per curiam 319 F. 2d 132.

After a careful review of the evidence, we must conclude that the parties never bargained for the covenant as a separate item; that they never allocated a portion of the purchase price to it themselves; that it was gratuitously added to the sales agreement as a routine matter without having been made a condition for the purchase; and that, in actuality, Investors paid nothing for it.

Our findings have been based upon the testimony of the important principals involved in the transaction: Kinsey, Leyhe, Tanner, Squires, and Haden. Investors' contentions are based largely upon the testimony of Kinsey which covered the details of the bargaining.

Kinsey, who represented Investors in the transaction and who was a certified public accountant, spent about 1 day studying the financial situations of Colonial and of its subsidiaries and in discussing the background of the corporations with Leyhe. We think it is clear that by the end of this day, October 17, 1957, Kinsey had concluded that he would offer Tanner, as the representative of the Colonial stockholders, $16.60 per share for the stock. By the evening of October 17, Kinsey had made a firm offer to Tanner of this amount after the two men had negotiated extensively about the liabilities of Colonial.

We have detailed in our findings how Kinsey arrived at the offering price, which was accepted, and how Kinsey studied the Colonial corporations, and what factors he took into account in making the offer. By Kinsey's own admission, a covenant not to compete was never mentioned by the parties until the morning of October 18, 1957, when the final draft of the sales agreement was to be prepared. By this time, the price for the stock had been agreed upon and Kinsey and Tanner had obtained in writing the necessary authority to execute the agreement. When Tanner and Kinsey conveyed the information to their respective principals in order to obtain the authorization, nothing was or had been said about a covenant not to compete. The secretary of Investors merely wired Kinsey that he was authorized to purchase the stock at no more than $16.60 per share.

More importantly, it appears from Kinsey's testimony that he put no value upon a covenant not to compete in arriving at the offering price. Investors maintains that Kinsey would not have entered into

the transaction without such a covenant, yet Kinsey, in appraising the assets of the Colonial corporations to arrive at an offering price, merely valued certain assets at book value and notes receivable at a certain premium which was slightly higher than another potential purchaser had employed in making an offer.

We doubt that Kinsey even considered a covenant not to compete before it was mentioned by the attorney who had drafted the agreement. He did not mention it; he did not place a value upon it; and the loose form that it finally assumed in the agreement indicates that little thought had been given to it.

The evidence is undisputed that the covenant was first mentioned at the final meeting in Tanner's office on the morning of October 18, 1957. Haden, who prepared the agreement, and Tanner have testified that Haden suggested the covenant—or, at least, raised the question of whether a covenant not to compete was to be included in the agreement. Kinsey has testified that he first suggested the covenant. We conclude that it makes little difference who first mentioned the covenant before the agreement was executed in final form. The fact remains that Kinsey had never mentioned it in the negotiations and that he treated it superficially in the agreement.

Kinsey also testified that he was apprehensive that stockholders of Colonial who were apparently not active in the management of Colonial or of its subsidiaries would enter the small loan business because they had a proven ability to obtain State small loan company licenses. Yet Kinsey did not take steps to assure that the covenant—which prohibited only certain selling stockholders from engaging in *management* of small loan companies—protected Investors from these stockholders investing in the stock of a small loan corporation.

Also Kinsey did not show concern for a covenant when an attorney was engaged to prepare the agreement. Kinsey testified that he expected Haden to protect the interests of investors and that he retained him for that purpose. But it was Tanner who contacted Haden. And Haden has testified that he was not retained to protect any party's interest but that he was only a scrivener preparing an agreement, the terms of which had been negotiated by the parties before he was contacted. Admittedly, Kinsey did not confer privately with Haden at any time prior to executing the agreement nor ask his advice. Kinsey did not seek Haden's counsel, and we do not believe that Kinsey actually looked to Haden to represent Investors.

Finally, each stockholder of Colonial received from Investors $16.60 per share for the Colonial stock, regardless of whether they entered into the covenant not to compete. In other words, those stockholders who were excluded from operation of the covenant received as much for their stock under the agreement as those stockholders who are peti-

tioners herein. This is convincing evidence that Investors paid nothing for the covenant.

No one of the foregoing factors is conclusive on the issue. See *Annabelle Candy Co.* v. *Commissioner, supra.* But taken in their totality they convince us that no portion of the amount which Investors agreed to pay under the agreement of October 18, 1957, is properly allocable to the cost of the covenant not to compete.

We are constrained to hold in favor of the petitioners who were the selling stockholders. Our holding makes it unnecessary to consider *what* amount is properly to be allocated to the covenant (none was stated in the agreement) or what may have been the life of the covenant.

With respect to the second issue, Investors maintains that some portion of the amount which it paid under the agreement of October 18, 1957, should be allocated to a premium for notes receivable or loan accounts, or some sort of intangible asset other than goodwill, and that this intangible asset had a determinable life over which the cost of such premium may be amortized. Investors cites no direct authority for the right to amortize and deduct amounts paid for such premiums,[3] but we find it unnecessary to consider the merits of this proposition because we have concluded that Investors has failed to prove that any part of the amounts it paid the stockholders of Colonial for their stock was paid as a premium for such intangibles.

Manifestly Investors cannot amortize the cost of Colonial stock, and the simple fact of the matter is that Investors bought only the stock of Colonial, not its assets. We are aware of no authority, and petitioner Investors has cited us none, which holds that the purchaser of the stock of a corporation may have deductions for amortization or depreciation for amounts paid for the stock on the grounds that the assets of the corporation had a limited life and that the cost of the stock was fixed by reference to the value of the assets—unless, of course, acquisition of the stock was merely the first step in obtaining the assets by distribution in liquidation, in which case the cost of the stock is allocated among the distributed assets.[4] See *North American Loan & Thrift Co. No. 2, supra.* Here, Investors did not acquire the stock of

---

[3] In *North American Loan & Thrift Co. No. 2,* 39 T.C. 318 (1962), affirmed per curiam 319 F. 2d 132, which involved premiums paid for loan accounts, we said, "assuming that petitioner was entitled to amortize the total premium paid therefor, petitioner admits it should have done so" prior to the year then involved.

[4] By letter dated Oct. 29, 1964, counsel for Investors directed the Court's attention to *Seaboard Finance Co.,* a Memorandum Opinion of this Court filed Sept. 28, 1964. That case is distinguishable on the facts and the evidence produced. In all except one instance the taxpayer in that case purchased *assets* of other small loan companies, including the loan contracts, and proved that it paid a premium *for the loan contracts.* In the one instance in which the transaction took the form of purchase of stock, it is not clear from the opinion but it appears obvious from the general pattern of the other transactions involved that the stock was acquired as a step in an integrated transaction to acquire the assets of the corporation. We find nothing in the opinion in the *Seaboard* case inconsistent with the statement made above.

Colonial as the first of a series of steps by which it was to obtain its assets. Part of the loans which Kinsey stated he took into consideration in determining a price he would pay for the Colonial stock were assets of Colonial and the rest of them were assets of Colonial of Martinsburg and Colonial of Weirton. The evidence indicates that all three of these companies continued to exist and operate and there is no evidence that any of these loans were transferred to Investors. Any excess in value of these loan contracts over their face value would be realized by the three Colonial companies, not Investors, except indirectly. It follows that Investors may not amortize the purported cost of assets which it did not acquire; these assets remained the property of Colonial and its subsidiaries and did not assume an increased basis by virtue of the purchase of Colonial stock.

For completeness we add that in our opinion Investors has failed to prove by competent evidence the amount of any premiums it might have paid for the loan accounts and the period over which such premiums might be amortized.

We conclude that Investors is not entitled to deduct any part of the amounts it paid the stockholders of Colonial for their stock as amortization, depreciation, or otherwise, in the years here involved.

> *Decisions will be entered for the petitioners in docket Nos. 93034, 94403, 93035, 93036, 93116, and 93172.*
>
> *Decision will be entered for the respondent in docket No. 738–63.*