HOME JUICE COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Home Juice Co. v. Commissioner
Docket No. 701-76.
United States Tax Court
T.C. Memo 1977-386; 1977 Tax Ct. Memo LEXIS 58; 36 T.C.M. (CCH) 1566; T.C.M. (RIA) 770386; November 3, 1977, Filed Joel L. Miller and William E. Rattner, for the petitioner. James F. Kidd, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in the amounts of $52,391.23 and $27,669.35 in petitioner's Federal income taxes for 1971 and 1972, respectively. The issues in controversy are: 1. Whether petitioner recognized income under section 61(a)[1]/ in the form of purchase rebates of $109,148.44 and $59,260.30 paid to its sole shareholder during 1971 and 1972, respectively. 2. If it is required to include in income the purchase rebate payments, whether petitioner is entitled to an offsetting deduction under section 162(a), as compensation for services, or under section 1253(d)(1), as a result of the transfer, sale, or other disposition of certain distribution agreements. FINDINGS OF FACT Petitioner Home Juice Company, Inc. (hereinafter petitioner), was incorporated under the laws of the State of Wisconsin on or *60 about November 26, 1962. When its petition was filed, petitioner's principal office was located in Kenosha, Wisconsin. Petitioner filed its Federal income tax returns for 1971 and 1972 with the Internal Revenue Service Center, Kansas City, Missouri. During 1954, Milton Hess (hereinafter Hess), as a sole proprietor, started selling bottled juices in the Waukegan, Illinois area. Hess bought the bottled juices from Home Juice Company (hereinafter Chicago), a corporation based in Chicago, Illinois, and resold them in territories designated by Chicago. His work included the promotion of product interest and the development of wholesale distributorships within the territory. During the ensuing years prior to 1960, Hess, by his personal efforts, expanded his business from a single territory around Waukegan, Illinois, to territories in Wisconsin, Minnesota, Indiana, Ohio, and Kentucky. This expansion was due largely to the efficient manner in which Hess organized and operated his business. Hess made all his juice purchases from Chicago. Within each territory Hess designated a branch manager who, along with Hess, was responsible for finding and maintaining buyers for the juice *61 products, collection of the payments received for these products, maintaining records thereon, and organizing and directing the work of a group of routemen who delivered the products to the buyers. These routemen owned their own trucks. Neither the branch managers nor the routemen were salaried employees of Hess. Their earnings were measured by commissions on their sales. During the late 1950's, after establishing this system in each of his territories, Hess visited the areas periodically to insure that the operations were running smoothly and to deliver to the routemen the juice products which he had purchased from Chicago. In order to increase sales, Hess helped the branch managers and routemen get established. He also occasionally sponsored incentive programs. By 1960, sales had increased to the extent that Hess was purchasing 15,000 jugs (i.e., half-gallons) a week from Chicago. Hess was considered Chicago's "No. 1" customer from the late 1950's to the time of petitioner's formation. On or about June 1, 1960, Hess entered into three distribution agreements with Chicago which formalized the pre-existing relationship between the parties. These agreements established *62 the areas in which Hess had exclusive distributorships for Chicago's juice products. The agreements also required Hess to diligently service customers in each sales territory, refrain from selling non-Chicago products, maintain trucks and storage facilities, keep route lists, and sell in strict compliance with Chicago's price list. In addition, the agreements forbade Hess, upon terminating his connection with Chicago, from competing with its products for a stated period of time and gave Chicago the right of first refusal on any sale of Hess' interest in the route lists. If the right was not exercised, Chicago still had to approve any purchaser. Chicago had similar contracts with other distributors. The distribution agreements signed by Hess on June 1, 1960, provided that they were personal contracts between Hess and Chicago. Chicago would have stepped in and performed needed services if there had been a physical, legal or other disability on Hess' part. The contracts ran for an initial term of 5 years and were subject to renewal. By an agreement dated March 5, 1965, between Chicago and Hess, under a "Temporary Arrangement" the distribution agreements were extended for 6 months, *63 i.e., until November 30, 1965. By successive extensions, the agreements were amended to fix a termination date of June 1, 1968. On that date, the formal agreement expired, but Chicago and Hess and petitioner continued to conduct their business on the same terms until October 1, 1972. By a separate agreement dated June 1, 1960, between Hess and Chicago, Hess obligated himself to devote his full time to the development of sales in the exclusive territories covered by the three distribution agreements. He agreed not to expand such territories or to request additional territory for the distribution of Chicago's products until his total weekly sales volume reached 17,000 half-gallon bottles of juice averaged over 4 consecutive weeks. Paragraphs 2, 3, 4, and 6 of this separate agreement are as follows: 2. Hess agrees that he will not during the term of this Agreement and any renewals hereof and for a period of one (1) year after the termination of this Agreement sell or attempt to sell or employ others to sell or attempt to sell either directly or indirectly any products similar or competitive to the products of the Company, regardless of package sizes or types, to any customer *64 or customers at wholesale or retail within that territory described as extending 400 miles in any direction from the city limits of Chicago, Illinois. 3. This agreement shall not in any way affect, amend, change, or modify any distribution agreement entered into between the parties hereto contemporaneously herewith or at any other time. 4. Recognizing the combined present and future potential volume of the Hess distributorships presently granted, and those which might be granted in the future, and further recognizing the fact that such distributorships are operating many miles from the Company's Melrose Park plant, which necessitates long hauls and special handling of the Company's products, the Company agrees to the following freight allowances and quantity discounts on its products: (a) Company's present wholesale price structure contemplates purchases at the highest rate of 5,000-2 quart bottles per week. The Company herewith agrees to give Hess an additional discount from the Company 5,000 bottle price in the amount of one cent (1") per 2-quart bottle for all purchases from 10,000 to and including 14,999 bottles per week, and a discount in the amount of two cents (2") *65 per 2-quart bottle for all purchases in excess of 14,999 bottles per week. To qualify for this discount, the purchases by Hess are to be averaged over the last consecutive 4-week period. (b) The Company's present prices are quoted as delivered and the Company will allow a special freight allowance to Hess in the amount of six cents (6") per half-gallon bottle provided Hess shall accept billing f.o.b. Company dock on all such purchases and arrange and pay for his own pickup and delivery.Such pickup and delivery shall relate to all purchases, but the freight allowance shall apply only to the half-gallon bottles. (c) After Hess has reached a combined total of 20,000 bottles per week, the Company agrees to review the discounts herein set forth, taking into consideration any savings which may have resulted to the Company by reason of the added Hess volume. * * *
6. This Agreement is personal with Milton Hess in the same manner that the distributorship agreements with him relate, and it shall not be assignable without the express written permission of the Company. The agreement further provided that it was to become effective on June 1, 1960, and "continue to be effective *66 and operative for so long as any one of the three Distribution Agreements executed contemporaneously herewith shall be effective and operative and for any periods of renewal thereof." Although this separate agreement refers to a "discount" for quantity purchases and a freight allowance, in practice Chicago charged Hess the full price for the juice products he purchased and made cash rebate payments to him in the amounts of the prescribed discounts and allowances. During this period, Chicago had similar agreements with other distributors. However, in the case of those distributors with less reliable credit ratings, Chicago allowed purchase discounts and allowances rather than cash rebates. In November 1962, petitioner was incorporated as a means of eliminating Hess' personal liability on tort claims arising from the operation of the business. At their first meeting held on December 14, 1962, petitioner's board of directors adopted the following resolution: WHEREAS Milton Hess has heretofore conducted a business under the name of HOME JUICE COMPANY and has offered to sell the equipment, delivery customers and good will of said business to the corporation at book value of $30,461.94. *67 AND WHEREAS it appears to the directors that said property is necessary for the purpose of this corporation and that the same has a fair value of $30,461.94, NOW, THEREFORE, it is hereby resolved that the officers of this corporation be and they are hereby authorized and directed to acquire the properties set forth in exhibit A annexed hereto, together with all of the records relative to the distributor list set forth in exhibit B attached hereto, and upon the receipt of the same, to issue to Milton Hess, capital stock in the sum of $30,461.94. The properties set forth in exhibit A, referred to in this resolution, include an automobile, four trucks, and 14 trailers. The three distribution agreements and the additional separate agreement were not included in the list of property formally assigned or transferred to petitioner.The distributors listed on exhibit B, referred to in the resolution, were Hess' principal customers at the time of petitioner's incorporation. Hess' attorney, Charles J. Richards, recommended that the three distribution agreements and separate agreement not be transferred to the corporation because of their personal nature. Also, it was his opinion that *68 under Wisconsin law creditors could execute and levy on the unassignable contract rights of a debtor. Retaining the three distribution agreements and the separate agreement of June 1, 1960, in Hess' name thus would insulate them from the claims of petitioner's creditors. Consequently, the agreements were not transferred to petitioner. In 1962, when petitioner was incorporated, Hess was purchasing from Chicago between 30 and 40 thousand half-gallons of juice per week. At that time, a distributorship with that volume of sales, based on $10 per half-gallon, would have been valued at between $300,000 and $400,000. Although the three distribution agreements were not formally transferred to petitioner when it was incorporated, nonetheless petitioner, rather than Hess, there-after became the actual purchaser and seller of the juice products. Petitioner performed the obligations formally imposed upon Hess by the distribution agreements in carrying on its buying, hauling, delivery, and sales activities. Further, as required by the agreements, petitioner diligently serviced customers, refrained from selling non-Chicago products, and maintained its delivery trucks, storage facilities, *69 and route lists as Hess had done prior to petitioner's incorporation. In the early 1960's, the nature of Hess' business had changed in one respect. Rather than selling to numerous small purchasers in each of his territories, he began to sell to subdistributors who in turn serviced the small customers. After its incorporation, petitioner continued this policy. After petitioner's incorporation in November 1962, Chicago continued for nearly 10 years to make "rebate" payments to Hess. The amounts of such payments, as provided in the separate agreement of June 1, 1960, were based on petitioner's juice purchases from Chicago. In October 1972, Chicago's president asked Hess to agree to forego any payments directly to him. Hess so agreed, and the rebates ceased. However, Chicago reduced the price charged petitioner for the juice products by an amount equal to the payments previously made to Hess. This change was made in connection with the installation of a computer bookkeeping system. Commencing in 1960 and continuing through 1972, Hess reported as income on his tax returns all the rebate payments he received each year from Chicago. Petitioner did not report any part of such *70 payments on its income tax returns. After petitioner was incorporated, Hess served as its president and director, and he continued to work in the same manner as he did prior to petitioner's incorporation, especially in the area of working to increase sales. However, petitioner hired people to assist Hess in his activities. During 1971 and 1972, petitioner employed, in addition to Hess, three semi-truck drivers, a bookkeeper, a secretary, and Joseph Vlahovic, the dispatcher-vice president. In addition to his responsibility of maintaining the dispatching lists, Vlahovic also occasionally visited customers. Hess continued, however, to make the majority of these calls. Although petitioner reimbursed Hess for most of his expenses resulting from these trips, Hess at times paid the costs of sales incentive activities.
From 1963 to 1972, Hess' salary from petitioner was as follows: Year
Annual Salary
1963
$ 0
1964
5,309.26
1965
7,900.00
1966
7,800.00
1967
7,800.00
1968
12,480.00
1969
14,310.00
1970
14,040.00
1971
16,200.00
1972
37,600.00 The large increase in 1972 was due to the fact that the rebates from Chicago stopped in that year. From 1962 *71 until 1972, petitioner did not claim deductions on its Federal income tax returns for the rebate payments as compensation to Hess, nor did it accrue or otherwise record them in any manner on its books and records. Petitioner's 1971 and 1972 Federal income tax returns disclosed the following: Gross Profit
Net Year
Sales
From Sales
Income
1971
$1,702,451.54
$304,314.96
$18,232.62
1972
$1,491,942.18
$300,902.45
$ 8,622.03
In the notice of deficiency, respondent determined that purchase rebates of $109,148.44 and $59,260.30, received by Hess from Chicago in 1971 and 1972, respectively, constituted income to petitioner under section 61(a). The resulting deficiencies were computed by including these amounts in petitioner's taxable income for those years. OPINION 1. Taxability of Rebates to Petitioner
Respondent contends that petitioner earned the income represented by Chicago's payments to Hess and that such income is, therefore, taxable to petitioner under section 61. [2]/ Petitioner maintains that Hess, not petitioner, earned the payments he received from Chicago. Petitioner argues that such payments represented (1) compensation *72 for Hess' services predating petitioner's incorporation, (2) compensation for his services in continuing to solicit and service distributorships in the territories assigned to him in the distribution agreements, and (3) consideration for the covenant not to compete contained in the separate agreement of June 1, 1960. We think respondent has the better side of the argument. The basic legal principle to be applied here, as enunciated in the time-honored case of Lucas v. Earl,281 U.S. 111 (1930), is that income is taxable to the person who earns it. While that principle is easy to state, it is often difficult to apply to a given set of facts. Its application is particularly difficult in *73 a situation like this one where an individual for a period of years has performed sales services, received compensation therefor, and unquestionably realized income but then creates a corporation and continues to perform the same services and to receive the same type of payments. In that situation, the earner-of-the-income test requires a decision as to whether the individual performs his services in an individual capacity or as a corporate officer. Reaching that decision requires a careful consideration of all the facts. Ballentine Motor Co. v. Commissioner,321 F.2d 796, 798 (4th Cir. 1963), affg. 39 T.C. 348 (1962); American Savings Bank v. Commissioner,56 T.C. 828, 839 (1971). We think the payments Hess received from Chicago during 1971 and 1972 were income earned by petitioner. It is true that Hess, when he created petitioner, did not formally assign the distribution agreements to petitioner. However, petitioner was permitted to, and did, buy juices from Chicago on the terms prescribed in the three distribution agreements and the separate agreement of June 1, 1960. [3]/ Moreover, petitioner discharged the obligations *74 assumed by Hess in the distribution agreements. It developed and serviced its assigned territories and its customers. It purchased, stored, sold, and delivered the juices. It maintained a route list of its customers. To carry out the obligations it discharged under the distribution agreements, petitioner employed personnel, including Hess, and incurred expenses. In every real and practical sense, when petitioner was organized, it stepped into Hess' shoes in the operation of the distributorships. [4]
*75 Significantly, the disputed payments Hess received from Chicago were derived directly from the business conducted by petitioner, that of buying and selling juice. See Ballentine Motor Co. v. Commissioner,supra;United Dressed Beef Co. v. Commissioner,23 T.C. 879, 885-886 (1955). While it is stipulated that Hess and Chicago referred to the payments here in dispute as "rebates," the separate agreement of June 1, 1960, does not so describe them. It refers to such payments as "discounts," allowed on the basis of the quantity of the purchases, and as a "special freight allowance," made in recognition of the fact that the "distributorships are operating many miles from the Company's [Chicago's] Melrose Park plant, which necessitates long hauls and special handling of the Company's [Chicago's] products." In 1971 and 1972, the years here in dispute, petitioner, not Hess, made the purchases which triggered the quantity discounts. Similarly, petitioner, not Hess, bore the expense of the extraordinary long hauls and special handling of the juices which caused Chicago to grant the special freight allowances. Hess, in his individual capacity, did *76 nothing to earn either. Thus, petitioner earned the discounts and the special freight allowances and is taxable on them. We do not think the evidence will fairly support a finding, as argued by petitioner, that Hess received the payments reflecting these discounts and allowances as compensation for Hess' services to Chicago predating petitioner's incorporation. While Hess began doing business with Chicago in 1954, there is no evidence to show that Chicago owed him any discounts or special freight allowances for the period prior to the signing of the June 1, 1960, separate agreement.That agreement, as we read it, is prospective only. The quantity discounts and special freight allowances were to be measured exclusively by Hess' purchases after that date.Chicago made the contract to obtain future benefits to itself through increased sales and not to compensate Hess for past services. Nor is there any real basis for holding that Chicago made the payments to Hess to compensate him for his continuing efforts to increase sales. True, as petitioner's sales grew Chicago's payments to Hess, measured by the quantity discounts and special freight allowances, increased. But Hess was employed *77 and paid by petitioner. His services after petitioner was organized were performed as its president, not in his individual capacity. According to schedule E attached to petitioner's 1972 Federal income tax return, [5]/ Hess was paid a salary of $37,600 for his services as president of the corporation, and he devoted his "full" time to petitioner's business. Significantly, Hess' salary was increased from $16,200 in 1971 to the higher 1972 figure when, in October 1972, the Chicago payments ceased. Hess' income-producing activity is not severable from his position as a corporate officer. See American Savings Bank v. Commissioner,56 T.C. at 842; Moke Epstein, Inc. v. Commissioner,29 T.C. 1005, 1011 (1958). The fact that he incurred incidental personal expenses in sponsoring occasional sales incentive programs does not alter this conclusion. *78 In United Dressed Beef Co. v. Commissioner,supra, officers and owners of all the stock of a corporation, engaged in slaughtering cattle and hogs during World War II, received overceiling payments for meat and did not turn such payments into the corporation. They argued that the payments were made to them in their individual capacities. Holding the overceiling collections were income to the corporation, this Court said (supra at 885-886): The meat sold was owned by the corporation and the amounts collected were measure by the pounds of meat sold to customers of the corporation. * * * These amounts do not resemble tips to a minor employee, for no additional services were rendered as consideration for them and the responsible officers of the corporation directed these collections. On these facts we have found that the overceiling collections were made by the corporation. * * * Similarly, in the instant case, Hess owned all the stock of petitioner. The payments representing quantity discounts and special freight allowances which he received from Chicago were measured by petitioner's purchases from Chicago. Hess was employed by and served as petitioner's *79 full-time president and performed no services for Chicago to earn the payments.We think Chicago's payments to Hess were income earned by petitioner. It is true that the June 1, 1960, separate agreement contained the covenant not to compete quoted in our Findings, but we find no merit in petitioner's contention that the payments reflecting the quantity discounts and special freight allowances were consideration for that covenant. The June 1, 1960, separate agreement shows otherwise. One of the introductory clauses recites that "the Company desires to establish additional quantity discounts for the substantially increased volume from the combined Hess operations," and this language shows the purpose of those discounts.As quoted in our Findings, the agreement recites that the special freight allowances were to be granted because Hess' "distributorships are operating many miles from the Company's [Chicago's] Melrose Park plant." Moreover, the distribution agreements contained far more severe noncompetition covenants [6]/ than the June 1, 1960, separate agreement. No identifiable portion of Chicago's payments to Hess can be attributed to the covenant not to compete. Baldarelli v. Commissioner,61 T.C. 44, 51-52 (1973); *80 Rich Hill Insurance Agency, Inc. v. Commissioner,58 T.C. 610, 618 (1972); Miller v. Commissioner,56 T.C. 636, 651 (1971); Johnson v. Commissioner,53 T.C. 414, 425 (1969); Howard Construction, Inc. v. Commissioner,43 T.C. 343, 355-356 (1964). *81 2.Offsetting Deduction Issue
Section 162(a)(1) allows a deduction for all the ordinary and necessary expenses paid or incurred in carrying on a trade or business, including a reasonable allowance for salaries or other compensation for services actually rendered. Alternatively, petitioner argues that, if Chicago's so-called rebate payments are taxable to it, an offsetting deduction is allowable under section 162(a)(1) as a compensation expense. We agree. The classification of a payment as compensation or as, in the instant case, a constructive dividend, depends upon the purpose for which the payment was made. In the words of section 1.162-7(a), Income Tax Regs.: "The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services." Regardless of the label given a payment, it may be found to be compensation if that was so intended. Compare Commissioner v. Multnomah Operating Co.,248 F.2d 661, 663 (9th Cir. 1957), affg. a Memorandum Opinion of this Court, with J. J. Kirk, Inc. v. Commissioner,34 T.C. 130, 139-140 (1960). *82 Paula Construction Co. v. Commissioner,58 T.C. 1055 (1972), affd. per curiam 474 F.2d 1345 (5th Cir. 1973), on which respondent relies, does not hold that the label given a payment is controlling. Rather the opinion repeatedly emphasizes the intention in making the payments. The instant case is complicated by the fact that Hess was not only the recipient of the payments but was also petitioner's sole shareholder and executive officer. Moreover, Chicago made the payments to him rather than to petitioner, and there was no occasion or opportunity for petitioner on its books and records to label the payments as compensation. Throughout this controversy petitioner has maintained that the payments were made to Hess to compensate him for his services to Chicago. While we have rejected that contention, we think the payments were compensation for services to petitioner even though petitioner did not so treat them on its books and records. We think the trial record shows that Hess received part of the Chicago payments in lieu of compensation he otherwise would have been paid by petitioner. His annual salary payments, detailed in our Findings, were *83 comparatively quite low. When Chicago ceased making payments directly to him in October 1972, petitioner increased Hess' salary from the level of $16,200 in 1971 to $37,600. Section 162(a), however, as noted above, limits the allowable deduction to "reasonable" compensation, and we must decide whether all or only a part of the claimed deduction is allowable. Petitioner points to Hess's testimony that his accountant advised him petitioner could pay Hess a sum equal to the rebates he would no longer be receiving from Chicago. But that testimony is hearsay insofar as it purports to relate to the reasonableness of the compensation. The record shows that Hess was an effective salesman and promoter. He had been in the juice distribution business since 1954. He had established good relationships with petitioner's network of customers. He worked long hours, devoting all his time to petitioner's business. Yet the magnitude of the earnings of the business is not sufficient to justify the compensation expense deduction petitioner claims.Total sales of $1,702,451.54 in 1971 and $1,491,942.18 *84 in 1972 produced gross profits from sales of $304,314.96 and $300,902.45, respectively. The net incomes for the two years were in the respective amounts of $18,232.62 and $8,622.03. Under our holding that Chicago's payments to Hess were taxable to petitioner, these gross profits from sales and net income figures will be increased by $109,148.44 in 1971 and $59,260.30 in 1972. From those amounts would have to be subtracted any additional compensation deduction. On consideration of all the evidence, we find that reasonable compensation for Hess was $60,000 each year, and petitioner is entitled to deductions in that amount. [7]/ To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.
2. /SEC. 61.GROSS INCOME DEFINED. (a) General Definition.--Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: * * *
(2) Gross income derived from business; * * *↩
3. /↩ There is testimony that petitioner, rather than Hess, bought the juice only to avoid the necessity for complying with Interstate Commerce Commission regulations which otherwise would have applied. While this testimony is not convincing, we need not evaluate it insofar as it refers to the reason for the arrangement. The undisputed fact is that petitioner did buy the juice from Chicago. 4. Petitioner is correct in its position that under Wisconsin law the person for whom the services are performed under a personal service contract must agree to any assignment thereof. United Contractors, Inc. v. Cantrall,42 Wis.2d 464, 167 N.W.2d 220, 222 (1969); Tullgren v. School District No. 1,6 Wis.2d 481, 95 N.W.2d 386, 388-389 (1959). While Hess made no formal assignments of his agreements with Chicago, petitioner assumed the obligations imposed on Hess under the agreements and purchased and distributed Chicago's products. Chicago's knowing acceptance of the benefits of this arrangement reflects its acquiescence in the informal assignment of the fruits of such agreements. Chatham Shipping Co. v. Fertex Steamship Corp.,352 F.2d 291, 294 (2d Cir. 1965); Paxson v. Commissioner,144 F.2d 772, 775 (3d Cir. 1944), revg. 2 T.C. 819↩ (1943).
5. /↩ For some reason not explained in the record, a schedule E is not attached to petitioner's 1971 Federal income tax return as stipulated in evidence. However, there is no evidence in the record indicating that Hess' duties as petitioner's president or the amount of time he devoted to performing those duties were any different in 1971 than in 1972. Nor is there any evidence indicating his duties changed after November 1972, when Chicago ceased making payments to Hess and began allowing discounts and making freight allowances as contemplated by the June 1, 1960, separate agreement.
6. / The noncompetition covenants contained in the distribution agreements are as follows: Upon termination of this Agreement for any reason or cause, whether voluntary or involuntary, Distributor agrees to surrender his current customer route lists to the Company and such lists shall thereafter be and become the sole property of the Company. In addition thereto, the Distributor agrees that during the term hereof or after any termination, he will not sell or attempt to sell or employ others to sell or to attempt to sell, either directly or indirectly, any product similar or competitive to the products of the Company, regardless of package sizes or types within a period of nine (9) consecutive months immediately following any termination either to any of the customers on any of the Distributor's route list or lists during the three (3)-month period preceding such termination or to anyone within the exclusive territory herein granted and as such territory may have been modified under Section 1 hereinabove, also for a period of nine (9) months following such termination. The Distributor further agrees that he will not disclose to any person any information concerning the number, locations or name of any customer serviced on his routes during the three (3)-month period preceding any termination either by himself or his employees or agents also for a period of nine (9) consecutive months following such termination date.↩
7. / Petitioner also makes the alternative argument that the Chicago payments were deductible pursuant to sec. 1253(d)(1)↩ as amounts paid on a "transfer, sale, or other disposition" of the distribution agreements. We find no merit in this argument. While the agreements may have been informally transferred to petitioner as a contribution of capital, they were not sold to it.