Ernest Stewart and Harriet B. Stewart, et al. [1] v. Commissioner. Stewart v. Commissioner
Docket Nos. 699-69, 767-69, 768-69, 769-69, 770-69, 771-69, 772-69.
United States Tax Court
T.C. Memo 1971-114; 1971 Tax Ct. Memo LEXIS 216; 30 T.C.M. (CCH) 485; T.C.M. (RIA) 71114; May 19, 1971, Filed Edward R. Kane and Earle B. May, for the petitioners in docket No. 699-69. Joseph P. Brennan and Richard Falcon, for the petitioners in docket Nos. 767-69 through 772-69, inclusive. James D. Burroughs, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined deficiencies in the income tax of each of the petitioners herein for the taxable year 1960 as follows: 486 Docket No.
Petitioner
Deficiency
699-69 [2]
Ernest and Harriet B. Stewart
$44,056.81
767-69
A.4. and Ruth N. Whitehurst9,981.54
768-69
Margaret G. Bibb
9,417.44
769-69
Thomas J. and Louise H. Whiddon
33,224.91
770-69
Louis and Fannie Lewitt
3,370.29
771-69
Norman and Barbara Goldstein
59,711.86
772-69
Joseph J. and Elsie G. Peeler
411.78
*217 The sole issue before us is whether respondent has erred in adding to the gross income of each petitioner as ordinary income his share of an amount alleged to have been paid each for a convenant not to compete. Other adjustments contained in the individual notices of deficiency have not bee placed in issue. Such adjustments will be given effect under Rule 50. Findings of Fact All facts which have been stipulated are found as stipulated. Ernest Stewart and Harriet B. Stewart are husband *218 and wife. At the time the petition was filed in this case, they resided at Thomasville, Georgia. For the taxable year 1960, petitioners filed a joint Federal income tax return with the district director of internal revenue, Atlanta, Georgia. A.J. and Ruth N. Whitehurst are husband and wife. At the time the petition was filed in this case, they resided at Thomasville, Georgia. For the taxable year 1960, petitioners filed a joint Federal income tax return with the district director of internal revenue, Atlanta, Georgia. Margaret G. Bibb, at the time the petition was filed in this case, resided at Thomasville, Georgia. For the taxable year 1960, she filed an individual Federal income tax return with the district director of internal revenue, Atlanta, Georgia. Thomas J. and Louise H. Whiddon are husband and wife. At the time the petition was filed in this case, they resided at Thomasville, Georgia. For the taxable year 1960, they filed a joint Federal income tax return with the district director of internal revenue, Atlanta, Georgia. Louis and Fannie Lewitt are husband and wife. At the time the petition was filed in this case, they resided at Thomasville, Georgia. For the taxable *219 year 1960, they filed a joint Federal income tax return with the district director of internal revenue, Atlanta, Georgia. Norman and Barbara Goldstein are husband and wife. At the time the petition was filed, they resided at Thomasville, Georgia. For the taxable year 1960, they filed a joint Federal income tax return with the district director of internal revenue, Atlanta, Georgia. Joseph J. and Elsie G. Peeler are husband and wife. At the time the petition was filed, they resided at Thomasville, Georgia. For the taxable year 1960, they filed a joint Federal income tax return with the district director of internal revenue, Atlanta, Georgia. Friendly Loan Company, hereinafter referred to as Friendly, was incorporated under the laws of the State of Georgia. The Class C common stock of Friendly, which was the only class of its common stock outstanding in May 1960, was held as follows: Percent of
Stockholder
ownership
Margaret G. Bibb
5.130946%
Norman Goldstein
20.363442
Joe I. Harris
14.484233
H. Kramer
2.137894
I. Kramer
19.454837
Louis Lewitt
2.405131
William C. Myers
2.939605
Ernest Stewart
12.399786
Harriet B. Stewart
2.993052
T. J. Whiddon
11.651523
Louise H. Whiddon
.106895
A. J. Whitehurst 5.932656
Total
100.000000
*220 Friendly also had outstanding $23,500 of nonvoting Class B preferred stock. 487 At the beginning of May 1960, Friendly, together with some of its stockholders and other parties, owned all of the outstanding stock of 11 corporations which were engaged in the small loan business in Georgia and Alabama under small loan licenses issued by the respective states. The subsidiaries of Friendly in May 1960, their location, and the percentage of stock in each subsidiary held by Friendly were as set forth below: *13
Location of Office
Subsidiary
Percent
City
County
State
Friendly Loan Company of Thomasville
99.4%
Thomasville
Thomas
Georgia
Friendly Loan Company of Quitman
99.4
Quitman
Brooks
Georgia
Friendly Loan Company of Adel
99.4
Adel
Cook
Georgia
Modern Loan Company
66.465364
Thomasville
Thomas
Georgia
Lamar Loan Company
70
Barnesville
Lamar
Georgia
Port Finance Company
91.22380
Bainbridge
Decatur
Georgia
Friendly Loan Systems, Inc.
65
LaFayette
Walker
Georgia
Luckie Strike Loan, Inc.
70
Cairo
Grady
Georgia
Friendly Loan Company of College Park
70
College Park
Fulton
Georgia
Friendly Loan Company of Albertville
70
Albertville
Randolph
Alabama
Friendly Loan Company of Ft. Payne
70
Ft. Payne
Dekalb
Alabama
*221 The percentage ownership of stock of each of the subsidiaries of Friendly held in May 1960 by stockholders of Friendly and by other persons in the case of Modern Loan Company and Friendly Loan Systems, Inc., was as follows: Friendly
Friendly
Loan Co.
Loan Co.
Friendly
Port
of Thomas-
of
Loan Co.
Modern
Finance
Lamar
Stockholder
ville
Quitman
of Adel
Loanco.
Co.
Loan Co.
Ernest Stewart
.1%
.1%
.1%
5.115453%
1.46270%
5%
T. J. Whiddon
.1
.1
.1
5.115453
1.46270
5
I. Kramer
.1
.1
.1
5.115453
1.46270
5
A. J. Whitehurst
.1
.1
.1
5.115453
1.46270
5
Joe I. Harris
.1
.1
.1
5.115453
1.46270
5
Norman Goldstein
.1
.1
.1
5.115453
1.46270
5
C. T. England
.710480
Joe Peeler
.710480
C. W. Dykes
1.420958
Friendly
Friendly
Luckie
Loan Co.
Friendly
Friendly
Loan
Strike
of College
Loan Co. of
Loan Co. of
Stockholder
Systems, Inc.
Loan, Inc.
Park
Albertville
Ft. Payne
Ernest Stewart
5%
5%
5%
5%
5%
T. J. Whiddon
5
5
5
5
5
I. Kramer
5
5
5
5
5
A. J. Whitehurst
5
5
5
5
5
Joe I. Harris
5
5
5
5
5
Norman Goldstein
5
5
5
5
5
Joe Peeler
5
*222 Several months prior to May 1960, J. Mack Robinson (hereinafter called Robinson), president of Dixie Finance Co., Inc. (hereinafter called Dixie), approached Ernest Stewart (hereinafter called Stewart), president of Friendly, in regard to Dixie purchasing the stock of Friendly and its subsidiaries. This conversation took place in Stewart's office in Thomasville. Stewart gave some hint at the meeting that the stockholders might be interested in a sale. During the early part of 1960, the principal stockholders of Friendly agreed that it would be desirable to explore the posibility of selling the businesses conducted by Friendly and its subsidiaries. During 488 February 1960, the board of directors of Friendly instructed Stewart to seek a buyer for such businesses for a total price of $750,000. A few weeks prior to May 24, 1960, Stewart explored the possibility of a sale with Robinson while they were attending the Georgia Consumer Finance Convention at St. Simons Island, Georgia. Either during this discussion or at some time prior to the stockholders' meeting of May 24, 1960, Robinson informed Stewart that under no circumstances would Dixie purchase the stock of Friendly or its *223 subsidiaries unless each of the petitioners executed a noncompetition agreement, and further, that each of petitioners would be required to accept a nominal amount of cash and a comparatively large amount of Dixie's debenture bonds as their share of any purchase price agreed upon. Ernest Stewart employed James D. A. Holley & Company, certified public accountants, to prepare a consolidated balance sheet of Friendly at March 31, 1960, and to prepare a computation in the manner in which the proceeds of the sale of the business of Friendly and its subsidiaries at a price of $750,000 should be allocated to the common stock of Friendly and to the stock in subsidiaries held by minority stockholders. During May 1960, Stewart negotiated with Robinson who offered on behalf of Dixie to purchase all the common stock of Friendly and its subsidiaries for a total price of $650,000. The board of directors of Friendly approved such a sale, recommended that it be accepted by the stockholders, and called a stockholders meeting to consider the matter. The aggregate fair value of the common stock in Friendly and the stock in its subsidiaries held by the minority shareholders was not less than $650,000. *224 All of the stockholders of Friendly and its subsidiaries (except Joe J. Peeler) met in May 24, 1960, with Robinson to discuss the offer by Dixie. At the meeting the stockholders reviewed a revised computation prepared by James D. A. Holley & Company recommending the manner in which the reduced aggregate purchase price of $650,000 should be allocated to the common stock of Friendly and the stock of its subsidiaries. That computation determined the portion of the sales price of $650,000 allocable to each stockholder of common stock in Friendly and in each of its subsidiaries, the total amount payable to each stockholder, the adjusted basis of each stockholder's aggregate investment in Friendly and its subsidiaries, and the amount of each stockholder's profit in the proposed sale. The Holley computation showed that of the $650,000 purchase price, $132,118.36 was allocable to stock in the subsidiaries of Friendly held by minority stockholders, and $517,881.64 was allocable to the common stock of Friendly. The computation allocating the aggregate purchase price of $650,000 to the stock of each of the affiliated companies was based on the respective book value and proportionate amounts *225 of accounts receivable held by each of the affiliated loan companies in the Friendly chain. The Holley computation contained no reference to any covenant not to compete but it allocated the purchase price of $650,0000 to each shareholder of Friendly and its affiliates in exact proportion to the shareholder's stock ownership in Friendly and its affiliates. Prior to leaving Atlanta, Georgia, in order to attend the meeting of stockholders in Thomasville on May 24, 1960, Robinson had Dixie's attorney prepare a sales contract providing for the sale of all the common stock of Friendly and all of the stock of its subsidiaries held by minority shareholders to Dixie for a total purchase price of $650,000. The stock sale agreement as prepared by Dixie in paragraph 1(c) stated: For the purchase price herein set forth, the undersigned Stockholders will transfer and convey unto Dixie, with full warranty of title, all of the oustanding stock of all of the said Affiliated Corporations except such of their stocks as may be owned by Friendly. The stock sale agreement also stated in paragraph 2, "The aggregate purchase price shall be $650,000.00." The stock sale agreement contained the following *226 information opposite each selling shareholder's name under the indicated caption: Total purchase price
for all this
Stockolder
stockholder's stock
Margaret G. Bibb
$ 26,572.23
C. W. Dykes
1,878.77
C. T. England
939.39
Norman Goldstein
126,344.45
Joe I. Harris
95,897.10
H. Kramer
11,071.76
I. Kramer
121,638.95
Louis Lewitt
12,455.73
William Myers
15,223.67
Joe Peeler
3,984.68
Ernest Stewart
$85,102.13
Harriet B. Stewart
15,500.47
Louise H. Whiddon
553.59
T. J. Whiddon
81,227.02
A. J. Whitehurst and Ruth N. w/hitehurst
51,610.06 489 The amount set forth after each shareholder's name in the column headed "Total purchase price for all this stockholder's stock" was the same amount set forth in the Holley computations as the portion of the $650,000 payable to such shareholder for his proportionate stock interest in Friendly and its affiliates. The stock sale agreement also provided in columns next to each selling shareholder's name, the amount of the purchase price receivable by each shareholder which the shareholder would take in cash and the amount he would take in the form of subordinated debenture bonds of Dixie having maturity *227 dates varying from 3 to 10 years and paying interest at 10 percent. The stock sale agreement was brought to the stockholders meeting of May 24, 1960, by Robinson and presented to the stockholders. During the shareholders' meeting, each shareholder's name was called out and each shareholder was asked to indicate what amount of the purchase price payable to him he desired to receive in cash and what amount he desired to receive in bonds. The stock sale agreement was then signed by or on behalf of all of the shareholders and Dixie. (Peeler's name was signed by Whitehurst as his agent.) Some of the shareholders of Friendly and its subsidiaries signed an agreement not to compete with Dixie. This noncompetition agreement was in the form of a letter addressed to Dixie and was signed by or on behalf of all of the shareholders except Dykes and England. It was not signed by Dixie. This noncompetition agreement referred to a written contract between Friendly and Dixie "for the future sale of designated assets." The document recited that "for the foregoing contract" and $526,150, receipt of which was acknowledged, the signing shareholders agreed not to compete with Dixie for a period of *228 5 years "within the county [in which] any office sold to the assignee [Dixie] is located." The noncompetition agreement made no reference to the purchase price of $650,000 payable under the stock sale agreement; it did not purport to show that the recited consideration of $526,150 was part of the total purchase price of $650,000 payable under the stock sale agreement; and it did not purport to show what part of the recited consideration of $526,150 was to be payable to any one of the selling shareholders. The noncompetition agreement was not mentioned by Robinson to any of the selling shareholders until after each shareholder had agreed to accept the purchase price listed by his name in payment for his stock and until after each such shareholder had also indicated how much of the purchase price receivable by him was to be taken in cash and how much in bonds. None of the selling shareholders were ever told that any portion of the purchase price which the stock sale agreement stated was "the total purchase price for this stockholder's stock" was payment for signing the noncompetition agreement. On May 25, 1960, all of the common stock of Friendly and all of the common stock *229 of its subsidiaries held by minority shareholders were delivered to Dixie in exchange for the amounts of cash and debt securities of Dixie as provided in the stock sale agreement. The only consideration paid by Dixie to the stockholders of Friendly and its subsidiaries in connection with the transaction was the cash and debt securities as provided in the stock sale agreement. Although C. W. Dykes and C. T. England did not execute the noncompetition agreement, they were both paid the amounts due them pursuant to the stock sale agreement. On May 25, 1960, Dixie Finance Company and Ernest Stewart entered into an agreement in which it is stated: Dixie hereby sells to Stewart and Stewart hereby buys from Dixie 1407 1/2 shares of the common stock of Modern Loan Company * * * for the purchase price of $129,770.98 * * * which is the same price paid for such stock and advances by Dixie. * * * The amount of $129,770.98 contained in this agreement was the correct value set by Dixie on the Modern Loan stock when it was sold to Stewart and it was the value which Dixie placed on the shares when it purchased the stock of Friendly and its affiliates from the Friendly shareholders. 490
*230 Although Ernest Stewart and Norman Goldstein executed the noncompetition agreement, immediately after consummation of the stock sale agreement, they acquired all the stock and became officers and directors of Modern Loan Company. Modern Loan Company was located in Thomasville, Georgia, as was the other office of the Friendly chain which was sold to Dixie. Ultimate Findings Dixie paid petitioners nothing for their agreement not to compete with Dixie. No part of the $650,000 purchase price of Friendly stock and that of its subsidiaries was paid for the covenant not to compete, the entire amount being paid for the stock of Friendly and its subsidiaries. Opinion This case again presents the question whether the taxpayer-seller of all the stock of a going concern received a consideration for his covenant not to compete with the purchaser for a fixed term of years. We think the evidence is strong and clear that the petitioners herein received nothing for a covenant not to compete. These petitioners were investors in the stock of Friendly and the stock of its 11 subsidiaries. None of them except Stewart were in a managerial or operating position with respect to that corporation *231 or its subsidiaries. As stockholders, they directed Stewart, the manager and operator, to negotiate and complete a sale of all stock of Friendly and individually held stock of the subsidiaries. Stewart did so and conveyed the result to petitioners at a formal stockholders' meeting. At that meeting, a formal acceptance of Dixie's (the prospective purchaser) offer of $650,000 for all such stock was adopted by petitioners by formal resolution. As a result of this acceptance, Dixie's representative, Robinson, appeared in Thomasville, Georgia, the home of Friendly on May 24, 1960, prepared to consummate the sales transaction. Robinson was prepared with a sales agreement already drafted which in clear and unambiguous terms provided not only an aggregate sales price of $650,000 for all the stock of Friendly and that of its subsidiaries, but in meticulous detail contained the breakdown as to the amount to be paid either in cash or debenture bonds for the shares of each petitioner and of other sellers not party to this action. The sales agreement does not mention an agreement not to compete either directly or by the faintest implication. On the date mentioned, the sales agreement was fully *232 executed by all of Friendly's stockholders at a stockholders' meeting. Until subsequent to the execution of the sales agreement, neither Robinson nor anyone else at the meeting mentioned a covenant not to compete. Immediately after execution of the sales agreement, Robinson phoned his attorneys who dictated over the phone the noncompete agreement, portions of which are set forth in our Findings of Fact. After preparation thereof, Robinson informed petitioners that Dixie would not carry out its purchase of petitioners' or Friendly's stock unless each executed the noncompete agreement. Without any discussion of the stated consideration or any negotiation therefor, each stockholder signed the noncompete document except two who refused. [3] On the following day, the terms of the sales agreement were carried out by payment to each stockholder of the amount of cash and debenture bonds of Dixie designated therein. The aggregate amount of cash and bonds paid was $650,000, the two stockholders who had refused to sign the noncompete document being paid the same percentage of the aggregate amount as those who had signed. Such facts constitute strong proof that nothing was paid to the sellers for *233 their covenant not to compete. Howard Construction, Inc., 43 T.C. 343. The noncompete document on its face is unilateral, being unsigned by Dixie. It is in letter form and, literally read, states as a consideration for its execution, "the foregoing contract [the stock sales agreement] and Five Hundred Twenty-six Thousand, One hundred fifty dollars ($526,150.00)." No reference or mention is made therein to or of the $650,000 paid under the stock sales agreement. We are convinced that a literal reading of the agreement by these petitioners would not cause any of them to believe that the dollar consideration stated therein was to be considered a portion of the $650,000 consideration for stock agreed to in the prior stock sale agreement. Indeed, if it is read as respondent and Dixie would have it, certain 491 incongruities arise which are not explained by the record. Reducing the stated $650,000 *234 purchase price of the Friendly stock by an allocation therefrom of $526,150 to the covenant not to compete carries the unavoidable result that only the difference, $123,850, was the purchase price of all of the stock of Friendly and of all of its 11 subsidiaries. The incongruity arises because of two inconsistencies. In his answer, respondent has admitted that the fair market value of the stock here involved when sold was not less than $650,000. Secondly, Dixie in its May 24, 1960, side agreement with Stewart for repurchase of the stock of only one of Friendly's subsidiaries had agreed in effect that in the May 24 transaction, Dixie had paid in excess of $129,000 therefor. It is clear that there has never been a meeting of the minds between Dixie and petitioners, at the very least, with respect to any dollar consideration for their execution of the covenant not to compete with the result that the stated dollar consideration for execution of the document never attained the stature of a contract between them. Certainly Dixie has never paid or offered to pay petitioners any part of the dollar consideration. In form, the dollar consideration is stated as a separate and distinct amount *235 unrelated to the sales price of the stock. If it was the intention of Dixie to contract with petitioners for an allocation of a consideration to the covenant out of the stock sales price, then it is clear that there was a misleading of them which vitiates the agreement. Even reading the two documents as a single agreement leaves us with the same conclusion. Not only is there no economic reality to the noncompete agreement as evidenced by the unrealistic allocation of only $123,850 to the purchase price of all the Friendly stock as mentioned above, see Ray H. Schulz, 34 T.C. 235, affd. 294 F. 2d 52 (C.A. 9), but so far as these petitioners are concerned, it is fairly evident that Dixie had no real reason for concern that any of them, except Stewart, were potential competitors or that any of them possessed the necessary finances to establish a competitive small loan business. As a matter of fact, Dixie sold one of Friendly's subsidiaries to Stewart who proceeded to operat this subsidiary in direct competition with at least one of Dixie's subsidiaries. No attempt has been made by Dixie to enforce the covenant against Stewart or one of the other petitioners *236 herein who also acquired a stock interest in the business. We are not impressed with the testimony of Robinson, the representative of Dixie in this transaction. His statement, particularly with reference to the May 24 meeting during which the agreements in controversy were executed, is generally so vague and in some respects inconsistent that it is of little value when compared to that of some of the petitioners who testified emphatically that no negotiation other than that mentioned above took place with respect to the covenant not to compete. Assuming that Stewart, had he testified, would have substantiated Robinson's testimony, we would be left with nothing more in the way of evidence to the contrary than with Robinson's testimony alone. For the reasons stated above, we find respondent's citation of Ullman v. Commissioner, 264 F. 2d 305 (C.A. 2), affirming 29 T.C. 129; Hamlin's Trust v. Commissioner, 209 F. 2d 761 (C.A. 10), affirming 19 T.C. 718; Commissioner v. Danielson, 378 F. 2d 771 (C.A. 3), reversing 44 T.C. 549; and Balthrope v. Commissioner, 356 F. 2d 28 (C.A. 5), affirming *237 a Memorandum Opinion of this Court, inapposite for in each of those cases the allocation to a noncompete agreement is clear and unambiguous. Those and like cases involve valid, enforceable contracts not to compete while the case before us involves an alleged agreement not to compete which we find does not constitute an enforceable contract not to compete. Decisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: A.J. and Ruth N. Whitehurst, docket No. 767-69; Margaret G. Bibb, docket No. 768-69; Thomas J. and Louise H. Whiddon, docket No. 769-69; Louis and Fannie Lewitt, docket No. 770-69; Norman and Barbara Goldstein, docket No. 771-69; and Joseph J. and Elsie G. Peeler, docket No. 772-69.↩
2. The case of Ernest and Harriet B. Stewart, docket No. 699-69, was heard separately from the other dockets herein upon the request of counsel based upon the fact that an additional issue under section 351, I.R.C. 1954, had been raised therein which did not involve the other petitioners. After trial of the Whitehurst, et al., cases. and upon the call of this docket for trial, such additional section 351↩ issue was conceded by petitioners and the case has been submitted upon a stipulation that the Whitehurst transcript may be taken as the transcript of record herein. Therefore, this docket has been consolidated with Whitehurst, et al., for the purpose of this opinion.
3. It is true that Robinson had during previous negotiations informed Stewart that Dixie would not complete the stock purchase unless it obtained a noncompetition agreement from petitioners, but no discussion of any allocation to that agreement is disclosed by the record.↩